

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

───────────────────────

No. 02-23-00220-CV

───────────────────────

BIANCO BRAIN AND SPINE, PLLC AND NIKHIL KANTI PATEL, M.D.,
Appellants

V.

LARRY JONES AND SHELLEY JONES, Appellees

───────────────────────────────────────

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-312620-19

───────────────────────────────────────

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I.  Introduction

Appellants Bianco Brain and Spine, PLLC and Nikhil Kanti Patel, M.D. appeal from a judgment in favor of Appellees Larry and Shelley Jones.  A jury found that Dr. Patel's medical negligence was a proximate cause of an injury to Mr. Jones that occurred when Dr. Patel operated on Mr. Jones's spine.  Mrs. Jones is Mr. Jones's wife; she recovered damages for the injuries allegedly suffered by Mr. Jones.  Bianco was held jointly and severally liable for the damages.

At trial, Mr. Jones presented evidence of several acts and omissions by Dr. Patel that he contends were injury-causing negligence.  On appeal, Dr. Patel's first issue raises a legal-sufficiency challenge, and his second issue raises a factual-sufficiency challenge.  Specifically, he contends that the proof is legally and factually insufficient on the applicable standards of care, on his alleged breaches of the standards of care, and on whether a breach of a standard of care proximately caused the injuries.  We conclude that the evidence is legally and factually sufficient to prove that at least one of the multiple standard-of-care breaches alleged by Mr. Jones caused his injury.  We therefore affirm the judgment as to Dr. Patel.

But because the Joneses waived their independent ground of recovery as to Bianco's respondeat superior liability by failing to submit a jury question on that ground, we reverse the part of the judgment imposing liability on Bianco, and we render judgment that the Joneses take nothing from Bianco.

## II. Factual and Procedural Background

### A. We set forth the background involving Mr. Jones, Dr. Patel, and the surgery.

When the surgery at issue in this case occurred in 2017, Mr. Jones was forty-seven years old. He had persistent back problems. Several years before Dr. Patel treated Mr. Jones, another neurosurgeon had operated on Mr. Jones's spine on two occasions. The first surgical procedure was a fusion performed at the L4-L5 and L5-S1 junctures of Mr. Jones's vertebrae. In essence, the goal of this procedure was to decompress pressure on nerves emerging from the spinal cord by making the vertebrae one solid bone to prevent movement. The procedure involved removing the disc between the vertebrae and implanting hardware to facilitate bone growth, which then fused the vertebrae together. An integral part of this surgery is a procedure that was referenced throughout the record as a laminectomy, which involves the removal of a portion of the vertebra called the lamina, with the lamina being an arch of bone or a "roof" protecting the spinal cord. The neurosurgeon who performed the first surgery performed another procedure two years after the first to address loosening of the hardware that had been implanted during the first surgery.

Approximately four years after the second surgery, Mr. Jones began experiencing pain that he described as follows: "Started getting leg pains down into my groin, into my privates, going down my right leg and into my left foot." Though

in pain, Mr. Jones continued to work as a machinist and to pursue other activities, such as umpiring baseball games and participating in outdoor hobbies.

Mr. Jones consulted with the surgeon who had performed the prior procedures, and that surgeon refused to operate; however, the surgeon gave Mr. Jones the option of seeking a second opinion. Mr. Jones learned of Dr. Patel through a family member. Dr. Patel's diagnosis—after imaging Mr. Jones's spine with a CT/myelogram—was that he had stenosis—a narrowing of the spinal sac that constricted nerves flowing from it—at the L3-L4 juncture, which is the juncture just above those operated on in the prior surgeries. Though the decision-making process that Dr. Patel engaged in with Mr. Jones is in dispute, the decision was made that Dr. Patel would (1) perform a laminectomy and fusion at the L3-L4 juncture of Mr. Jones's spine in an effort to relieve the compression of the nerves caused by the stenosis and (2) remove the hardware emplaced in Mr. Jones's spine during the prior surgeries. What occurred with respect to the preoperative, intraoperative, and postoperative care of Mr. Jones by Dr. Patel will be discussed in much greater detail below.

The timing and mechanism of Mr. Jones's injury was the central focus of trial. It is undisputed that after Dr. Patel had removed the existing hardware from Mr. Jones's spine—at the L4-L5 and L5-S1 juncture—and that while Dr. Patel was performing a laminectomy at the L3-L4 juncture to remove bone, a loss of signal

4

from the neuromonitoring[1] showed a total loss of the nerve signal running from Mr. Jones's spine to both of his legs. Until that time, the equipment had been registering a normal signal.[2]

The neuromonitoring process for this surgery was being observed by both a technician in the operating room and a neurophysiologist who monitored from a location outside the operating room. The technician and the remote neurophysiologist communicated with each other by texting via a chat record. The chat record indicated that the remote neurophysiologist warned that "a significant change" in the signal had occurred and that there was concern regarding a "surgical injury." Whether Dr. Patel acted within the standard of care to prevent a mechanism that caused the loss of signal and properly responded to it once it occurred was at the crux of the dispute in the malpractice claims made by Mr. Jones.

In recovery immediately after surgery, it became apparent that Mr. Jones had suffered an injury during the surgery—he could not move his feet. There is no dispute that Mr. Jones now suffers weakness in his lower extremities that leaves him largely confined to a wheelchair. He suffers as well from incontinence, bowel issues, and sexual dysfunction.

---

[1]In simple terms, neuromonitoring provides real-time output that "register[s] all the electrical conductivity that's . . . flowing through the body and through the nerves"; it is a crucial part of any neurosurgery.

[2]As Mr. Jones's counsel emphasized while questioning Dr. Patel, "We know [that] the exact moment you're drilling down on his spine he loses signal[] . . . ."

The consequences of Mr. Jones's postsurgical conditions have been devastating. He has lost his employment and the ability to participate in his lifelong hobbies. He also lost the home that he and Mrs. Jones owned and was forced to move into a smaller home with his parents and daughter. Mrs. Jones testified about the care that she had to provide; that care included assisting Mr. Jones at one point with the most intimate details while using the bathroom. Mr. Jones presented evidence that his future medical care will cost millions of dollars.

### B. We set forth the procedural background.

Mr. and Mrs. Jones sued Dr. Patel and Bianco, which the Joneses alleged was Dr. Patel's employer. The Joneses alleged that Dr. Patel had "breached [a] duty in performing, monitoring, and responding to various aspects of [Mr.] Jones'[s] spinal surgery, including but not limited to[] failing or refusing to perform a wake-up test, as well as causing neurologic[al] harm to [Mr.] Jones during the surgery."

The suit was eventually tried to a jury over the course of six days. The trial court denied Dr. Patel's motions for directed and instructed verdict, and the jury found (1) that Dr. Patel was negligent and (2) that his negligence was a proximate cause of injury. The jury awarded Mr. Jones past damages of $50,000 for physical pain and suffering; $1,000,000 for mental pain and anguish; $800,000 for physical impairment; $265,402 for medical expenses; and $285,898 for loss of earning capacity. With respect to his future damages, the jury awarded $200,000 for physical pain and suffering; $250,000 for mental pain and anguish; $1,200,000 for physical impairment;

$3,600,000 for medical expenses; and $998,889 for loss of earning capacity. To Mrs. Jones, the jury awarded $150,000 for past loss of consortium; $45,000 for past loss of household services; and $400,000 for loss of household services in the future.

The Joneses moved for entry of judgment, and Dr. Patel responded to that motion by claiming that the evidence was legally and factually insufficient to support the jury's negligence finding upon which the proposed judgment was based. Bianco objected to entry of the Joneses' proposed judgment against it, arguing that the Joneses had waived a vicarious liability claim against it by failing to request any jury questions necessary to recover under such a theory. The trial court overruled these objections and signed a judgment for the Joneses. The judgment awarded compensatory damages to Mr. Jones of $5,150,429.03 and to Mrs. Jones of $445,000. The judgment reduced the jury's awards of noneconomic damages to $250,000, which was apportioned $240,000 to Mr. Jones and $10,000 to Mrs. Jones. The judgment awarded prejudgment and postjudgment interest and made Appellants jointly and severally liable for the judgment's awards.

Appellants filed a motion for new trial or request for remittitur, and Bianco filed a motion for judgment notwithstanding the verdict. Both motions were denied by written order. Appellants then each filed a notice of appeal.

7

**C.    We detail the trial testimony with respect to Dr. Patel's care of Mr. Jones.**

Our detailed summary focuses on the expert testimony relevant to the questions of whether Dr. Patel was negligent and whether that negligence was a proximate cause of an injury to Mr. Jones. We will examine testimony from (1) Dr. Stephen Shafizadeh, a neurosurgeon who served as Mr. Jones's expert witness and who will be referred to as Plaintiff's Expert;[3] (2) Dr. Patel; and (3) Dr. Erich Richter, a neurosurgeon who served as Dr. Patel's expert witness and who will be referred to as Defendant's Expert.[4] We will also reference a portion of Mr. Jones's testimony that is relevant to what he was told by Dr. Patel.[5]

---

[3]We use the singular "Plaintiff" because the expert's testimony deals solely with Mr. Jones. Similarly, we use the singular "Defendant" when referring to "Defendant's Expert" because the testimony that we set forth deals solely with Dr. Patel.

[4]Both parties' experts testified as to their qualifications and to the documents that they had reviewed in preparation for their trial testimony. Plaintiff's Expert is a board-certified neurosurgeon; holds PhDs in microbiology, immunology, and transplant surgery; and at the time of trial was a doctor of chiropractic medicine who performed a 50/50 mix of complex cranial and spinal surgeries. He had reviewed the records of Dr. Patel's operation on Mr. Jones, the records of the neuromonitoring and "the films . . . in th[e] case," and the records of Mr. Jones's postoperative treatment. He had also reviewed Dr. Patel's deposition. Defendant's Expert, too, is board certified in neurosurgery and had administered a mentorship program for neurosurgery residents. He had performed thousands of operations on the lumbar spine. Defendant's Expert's thirty-seven-page curriculum vitae was admitted into evidence. Defendant's Expert testified that he had reviewed at least some of Mr. Jones's medical records, Dr. Patel's deposition, and Plaintiff's Expert's deposition and expert report.

[5]Other witnesses included Terry Mizell (mental health counselor); Larry Jones Sr. (Mr. Jones's father); Roger Huckfeldt, M.D. (a lifecare planner and damage expert);

In an effort to efficiently portray the somewhat chaotic record,[6] we will break down our summary by the specific criticisms that Plaintiff's Expert leveled at Dr. Patel's conduct at each operative stage, the facts that the expert offered to support those criticisms, and the facts that Dr. Patel relies on to rebut them both by admissions of Plaintiff's Expert and the facts that Dr. Patel presented through his own testimony and that of his expert.

**1.** **We set forth Mr. Jones's expert's underlying opinion regarding why Dr. Patel was negligent and why his negligence caused injury to Mr. Jones.**

Plaintiff's Expert encapsulated his opinion of Dr. Patel's alleged negligence and why that negligence had caused injury to Mr. Jones as follows:

> An injury happened at a segmental -- at a level in the spinal cord that completely explains his postoperative neurological examination and the timing of the events, [and] also lead[s] to the conclusion that injury happened during the surgery and at a critical moment in surgery that could potentially have been prevented or predicted.

Plaintiff's Expert supported this opinion by specifically opining that Dr. Patel's actions preoperatively, intraoperatively, and postoperatively had fallen below the standard of care and by further opining on how those actions had caused the injuries that Mr. Jones manifested after surgery.

---

Shannon Shipp, PhD (an economist and damage expert); Kaylee Jones (Mr. Jones's daughter); Barbara Baker (a friend of the Joneses); and Mrs. Jones.

[6]For example, as will become clear from this opinion's direct quotations to the record, Plaintiff's Expert often referred to a model while testifying, but his references to the different parts of the model are not clarified so that this court can determine what was being pointed out to the jury.

Plaintiff's Expert identified a number of factors that, in his opinion, showed presurgical instability in Mr. Jones's spine. These included conditions such as the loosening of hardware placed in Mr. Jones's spine during prior surgeries[7] and subsidence,[8] i.e., that the graft created during the prior surgery had caused the bones to grow improperly by "go[ing] into the bone above or below." Mr. Jones also exhibited retrolisthesis, meaning that a bone has moved backward onto another bone, which also could have caused instability within his spine.

Regarding the state of Mr. Jones's spine, Plaintiff's Expert testified as follows:

Q. So if a person has an unstable spine, how can a doctor tell that before they operate on him?

A. No. 1, history, it alludes to it. The history itself won't be defining, but it will start giving you clues of what type of pain they have, when is the pain exacerbated, when is it relieved. Okay? That starts giving you the clues.

. . . .

Q. And, again, Doctor, just because I don't think anybody in this room other than you and these two gentlemen over here are neurosurgeons, spinal instability is important to know about before operating because why?

---

[7]Plaintiff's Expert explained what the prior surgeon had done vis á vis the hardware: "To help with that cast material, not only do you place screws, you place material in the disc space, because the disc is where you move as well, to stop that motion in front and stop the motion in the back. It's an additional level of support."

[8]Plaintiff's Expert explained that "[s]ubsidence is when that material that you placed in there goes into the bone above or below . . . [e]ither [because] the bone has moved, which is instability, or what you placed in was placed into the bones initially and grew in further and further along. And that's also a potential sign of instability . . . ."

A. Because it helps you determine the operation and the order and sequence you would do the surgery.

Q. And why --

A. It wouldn't prevent you doing the surgery. It would help you to know what surgery to do.

Plaintiff's Expert also characterized this operation as more risky than normal because of Mr. Jones's prior surgeries: "To help with his symptoms with those nerves, you have to then come and decompress those nerves, take the pressure off, which is much riskier in someone's third surgery, much more time." When asked why, in his opinion, Mr. Jones had "so severe a stenosis at L3-L4" immediately before the surgery, Plaintiff's Expert replied, "Two reasons, most likely. One is his previous surgery, [and the second is that] there's a known greater incidence of adjacent segment disease over time."

On cross-examination, Plaintiff's Expert agreed that the prior surgeon's second surgery was done for loosened hardware, and he said that loosened hardware is "almost always an indication of [general] instability" but "doesn't necessarily mean spinal instability." Also significant was Mr. Jones's "axial pain, as well as his muscular pain, as his joint pain, as his discogenic pain." The "general sense" from the prior medical notes from orthopedics is that Mr. Jones had complained of pain at "more than one level."

Although Plaintiff's Expert at one point testified that Mr. Jones's spine was "potentially" unstable, in summing up his opinions on direct examination, he stated,

> It's the anatomical level; the timing of it is exactly when the instability is added; and it's just common sense. Not that that is necessarily enough, but if you add that to the neurosurgical background and medical knowledge, *I don't know what other conclusion you can come up with*.
>
> Now, if Mr. Jones had woken up with blindness, which is a potential complication of spine surgery, believe it or not, there's some things a surgeon can do that can increase that likelihood that are negligent; but, most often, it's other things -- we wouldn't necessarily be saying that Dr. -- the surgeon is negligent here. But that is not what happened.
>
> What happened is he's operating on L3-L4. The patient has injury at L3-L4. There's neuromonitoring that says there's injury to L3-L4. He is told that information. And the patient wakes up with deficits at L3-L4 and down. To come to any other conclusion that the injury didn't happen at L3-L4 and it's -- the cause is surgical, I would like to hear any other explanation. [Emphasis added.]

Plaintiff's Expert thus concluded, "[T]he cause of [Mr. Jones's] injury is the surgery at that level at that time. The sequence of events leading to those decision-makings, I have different opinions what should have been done. *During surgery, things should have been done in a different order."* [Emphasis added.]

Thus, Plaintiff's Expert explained at the outset why he believed Mr. Jones's surgery carried more risk than normal—and should have been executed in a different order—because of Mr. Jones's unique history.

**2. We set forth the contentions stating how Dr. Patel's preoperative actions breached the standard of care and proximately caused injury to Mr. Jones.**

Plaintiff's Expert's theories of negligence based on the preoperative conduct of Dr. Patel were premised on his overarching opinion that actually performing a back surgery is the "easy" part of the surgical process. In Plaintiff's Expert's view, preoperative planning is more vital than performing the surgery itself because proper preplanning prompts the surgeon to anticipate what complications may arise and to treat the patient himself rather than an "average." Only by appropriate planning can the surgeon know which of a number of ways to conduct back surgery is the one that "helps confine [the surgeon] down a path to minimize the risks and maximize the benefits." Plaintiff's Expert offered a number of ways in which he believed Dr. Patel had failed to adequately plan.

**a. We set forth Plaintiff's Expert's opinion that Dr. Patel breached the standard of care by not reviewing the medical records related to Mr. Jones's prior surgeries and Defendant's Expert's response.**

Plaintiff's Expert testified that for a patient such as Mr. Jones, who had undergone two prior back surgeries, a review of the patient's records was necessary to understand what "booby traps . . . to watch out for." In this case, review of the records was vital because of the risky surgical environment created by signs of spinal instability presented in Mr. Jones's history.

13

Plaintiff's Expert acknowledged that he had not reviewed the records of Mr. Jones's prior surgeries himself and admitted that he "[did not] know what information [was] contained in those records." But he also testified that he was nevertheless able to determine that Dr. Patel should have done things differently "[b]ecause of some of the commentary made about those records" by others.[9] According to Plaintiff's Expert, review of the records "could" have changed Dr. Patel's approach to the surgery because it could have enabled him to know what to have expected and because "the step-by-step process would inevitably have been affected if [he had] know[n] what [was]" in the records.

Plaintiff's Expert also acknowledged that he was unaware that in preparation for the trial Dr. Patel had been provided the records of Mr. Jones's prior surgeries, had reviewed them, and had stated, "I [have] looked at those records, and I wouldn't have changed a thing had I seen them before surgery."[10]

Defendant's Expert opined that, though reasonable, it was not mandatory to obtain such records. The more important task in this expert's view was to determine

---

[9] Throughout the record, the experts refer to their review of the others' opinions in the case. Plaintiff's Expert was not asked to explain what he had learned from others' commentary about the medical records.

[10] Questions asked by attorneys are not evidence. *In re C.F.M.*, No. 05-16-00285-CV, 2018 WL 1704202, at *4 (Tex. App.—Dallas Apr. 9, 2018, pet. denied) (mem. op.). Nevertheless, Dr. Patel testified that, by the time of trial, he had reviewed "medical records that [he] didn't have at the time of the surgery" and that he would not have done the surgery any differently.

14

the patient's current status by performing necessary tests. Defendant's Expert opined that Dr. Patel had done appropriate preoperative testing on Mr. Jones.

> **b.      We set forth Plaintiff's Expert's opinion that Dr. Patel breached the standard of care by not having flexion/extension X-rays taken and Defendant's Expert's response.**

As noted, Plaintiff's Expert stressed the importance of knowing the stability of a patient's spine as part of the surgical planning process to predetermine what complications might arise. Plaintiff's Expert testified that Mr. Jones had exhibited signs that his spine was unstable. One way to determine stability is to X-ray the patient in various postures to determine the stability of the spine when it is engaged dynamically.[11] This X-ray process was described at trial as flexion/extension X-rays. The purpose of the flexion/extension X-rays is to "help clarify the extent of surgery, [whether there] is . . . instability there, [and] the order of surgery."

Plaintiff's Expert was "critical" of Dr. Patel for not ordering flexion/extension X-rays of Mr. Jones as part of the preoperative process. In Plaintiff's Expert's view, the CT/myelogram testing that was performed by Dr. Patel preoperatively—and that showed Mr. Jones had severe compression at L3-L4—was not as revealing of instability as flexion/extension X-rays would have been. Plaintiff's Expert acknowledged that he did not know what the flexion/extension X-rays would have

---

[11]Plaintiff's Expert explained, "In Mr. Jones'[s] case, . . . I would have and it would have been standard to do that dynamic imaging to see if there's instability there[] because if there is, you *definitively* wouldn't have done the operation that was done in that order." [Emphasis added.]

15

shown had Dr. Patel ordered them. Dr. Patel's counsel had Plaintiff's Expert acknowledge that he would have obtained the X-rays "soon before surgery, and soon would be a relative term; maybe one to two months before surgery, at least, to have an idea . . . of what [to] be planning for."

Plaintiff's Expert also acknowledged on cross-examination that he did not know that flexion/extension X-rays had been performed on Mr. Jones purportedly a month before his initial visit with Dr. Patel, which would have been three months before Dr. Patel performed surgery.[12] When Plaintiff's Expert was shown a record of diagnostic studies reflecting the result of the flexion/extension X-rays that were performed, he refused to concede that they showed a lack of instability in Mr. Jones's spine:

> Q. All of those[13] are potential -- you were fair to say they're potential. It doesn't mean there's instability; it just means there's potential, right?
>
> A. In and of themselves, any single factor doesn't obviate that it's unstable. It's the collective information, yes.
>
> Q. Right. But a flexion/extension X-ray that's done that shows it's normal takes care of all those potentials? They are no longer potentials; there aren't instability indications, right?

_____

[12]Although Dr. Patel's counsel represented that the X-rays had been performed one month before Mr. Jones first saw Dr. Patel, Plaintiff's Expert acknowledged on redirect that nothing on the flexion/extension X-ray report that was admitted into evidence showed the actual date the X-rays were taken. The flexion/extension X-rays themselves were not admitted into evidence.

[13]Dr. Patel's counsel had been questioning Plaintiff's Expert about the risk factors that Plaintiff's Expert had testified showed instability in Mr. Jones's spine: prior loosening of hardware, subsidence, and retrolisthesis.

A. That's correct going into surgery[] but not during surgery.

The exchange continued as follows:

Q. So we're crystal clear now, preoperatively flexion/extension X-rays were done that would show that all the potential instabilities were nonexistent in Mr. Jones in this case?

A. As long as I don't touch the patient, yes.

Q. Right. Right. And preoperatively you really wouldn't touch the patient. You touch them at surgery is what you're referring to?

A. Correct. But there's certain surgeries that would not destabilize the patient, and there's certain surgeries that make those X-rays -- no information is added from those X-rays.

On redirect, Plaintiff's Expert was asked whether "a flexion/extension image from July, three months['] pre[]operation, [would] be sufficient to understand whether or not it was a stable operating environment," and he answered, "Not necessarily, no." He agreed that, without similar X-rays taken on the date of surgery, there was no way to know whether Mr. Jones's stability had been altered during that time. Ultimately, he testified that the flexion/extension X-rays were "but . . . a piece of the puzzle to know what to do during surgery," and he persisted in his opinion that Dr. Patel should have obtained and reviewed such X-rays to prepare for Mr. Jones's surgery.

Dr. Patel testified that he did not request flexion/extension X-rays because he had no "suspicion of instability." In support, he pointed to evidence of bone growth that had occurred at the location of Mr. Jones's prior surgery and the lack of indications of potential movement at the level where he had planned to operate.

17

Defendant's Expert also opined that preoperative flexion/extension X-rays were not necessary because "[w]hen you review all the imaging in the case, there's no evidence of any instability at any time point . . . during Dr. Patel's care."

    **c.**  **We set forth Plaintiff's Expert's opinion that Dr. Patel breached the standard of care by not meeting with Mr. Jones an adequate number of times to plan the surgery and Defendant's Expert's response.**

Plaintiff's Expert suggested, at least impliedly, that Dr. Patel may not have met with Mr. Jones the number of times that he should have. Plaintiff's Expert stated that it was his practice to "meet with the patient several times." However, he did not testify that Dr. Patel's two presurgical visits with Mr. Jones failed to meet a particular standard; instead, Plaintiff's Expert testified that "there's not a definitive number [of times to meet]. You have to meet with the patient enough that you and the patient are on the same page going into surgery." Defendant's Expert opined that Dr. Patel had adequately examined and tested Mr. Jones so that there was not any additional information that he needed "prior to surgery."

    **d.**  **We set forth Plaintiff's Expert's opinion that Dr. Patel breached the standard of care by failing to obtain informed consent from Mr. Jones and Defendant's Expert's response.**

Plaintiff's Expert opined that a surgeon needs to have an adequate appreciation of the severity of the patient's condition to be able to explain to the patient and his family the risks that the patient faced by having surgery and the precautions that could

18

be taken to avoid those risks. He also opined that fully informing patients so that they can make informed decisions is required by the standard of care.

Plaintiff's Expert would not tell the patient—as Mr. and Mrs. Jones testified that Dr. Patel had told Mr. Jones—that there was only a one-in-a-million chance that something bad would happen. In Plaintiff's Expert's view, informed consent is a two-way street that requires patients to understand the risks in order to know whether they would rather live with the pain that they are experiencing. Plaintiff's Expert later reiterated generally that it is the surgeon's responsibility to assess the risks of complications and to ensure that the patient understands those risks by conveying them appropriately to the patient.

Mr. Jones testified that Dr. Patel had told him during his first visit that he hoped that he could fix him up. Mr. Jones described his view as to what would occur after the second visit with Dr. Patel as follows:

> He -- he said he thought we could just get me going, get everything back to normal. That's the way -- the way I understood it, you know, just he was going to get rid of the pain in the groin and the -- and the testicles and get rid of the pain in the right leg.

Mr. Jones also testified regarding his understanding of what the surgery proposed by Dr. Patel would remedy:

> Q. And what was your understanding of what that surgery would fix?
>
> A. I thought it was going to fix my left leg pain and the right knee pain, the groin pain, and the pain in the testicles.

Q. And if you were given an option to have that same surgery just to fix your right leg between the thigh and the knee, is that -- is that something you would have done?

A. I would have never done that. That would have been crazy just because my worst pain was in the other side.

Plaintiff's Expert testified that if Dr. Patel had told Mr. Jones that he could "fix" him when the surgery proposed would address only a limited number of his complaints, then Dr. Patel breached the standard of care.

With respect to what he had disclosed to Mr. Jones, Dr. Patel relied on an assessment contained in the medical records that documents his discussions during the second office visit. The assessment provided the following:

> Comments: Mr. Jones has chronic severe low back pain/lower extremity pain radiation concerning for bilateral L3 radiculopathy in the setting of adjacent L3[-L]4 spondylosis with prior history of L4[-L]5 L5[-]S1 fusion and graft subsidence. I have discussed the role of L3[-L]4 PLIF/posterior extension of fusion/removal of old instrumentation and treatment of his low back pain and anterior thigh to knee pain radiation. I have discussed the R/B/A of surgery including persistent pain, infection, bleeding, need for further surgery, CSF leak, nerve root injury resulting in extremity weakness or numbness, hardware malfunction[,] or pseudoarthrosis. He understands and wishes to proceed with surgery[;] all questions answered. We will proceed accordingly.

On the question of what Dr. Patel had disclosed, Plaintiff's Expert agreed that the medical records contained the assessment and consent but opined that the assessment was vague. Initially, Plaintiff's Expert noted,

> I was a little confused based on the consent and the history that -- what operation they had agreed upon. I didn't get a sense from the medical records that Mr. Jones understood completely the operation. And even

the consent gave possibilities of either replacing the hardware or removing the hardware.

Plaintiff's Expert later elaborated on his opinion of why the assessment was vague as to what surgery was contemplated:

Q. (BY [Dr. Patel's attorney, quoting the assessment]) "I have discussed the role of L3[-L]4 PLIF . . . removal of old instrumentation and treatment of his low back pain and anterior thigh pain to knee pain radiation." Do you see that?

A. Right. And it actually reads, "posterior" -- "I have discussed the role of L3[-L]4 PLIF," posterior lumbar interbody fusion, "/posterior extension of fusion/removal of old instrumentation."

Q. That's what he's going to do. That's the surgery he's going to do, right?

A. This is my point, is if I'm -- I don't find this a clear consent of what he's going to do.

Q. Okay.

A. If he had a different discussion with the patient, however -- through the previous conversations we've had, I don't think the patient was clear either.

Q. Okay. Now, this --

A. But putting that aside, this is not clear to me what he's going to do.

Q. This doesn't say he may do this or it's an option to do this. He lists the three things he's going to do[,] and he puts a slash between each procedure, right?

A. But the removal of the old hardware or instrumentation, is it in completion? He has six screws here. You can remove them on one side. You can remove one of the screws. You can remove all of the screws. But it's a point that I don't think is, honestly, that important[] because if we're assuming this is one solid mass, it doesn't matter.

21

Q. Correct.

A. So this is not part of -- a big part of what led to the injury --

Q. Okay.

A. -- if you're assuming this is one solid mass.

Q. But "old instrumentation," every instrumentation in his body is old, correct?

A. In his spine, yes. I don't know if he's --

Q. Right. Okay. And he discussed this role in the treatment of his low back pain, anterior thigh[-]to[-]knee pain radiation, right?

A. Correct.

Q. He didn't say this was going to be treating his foot, right?

A. Correct.

Q. All right. And it wouldn't treat his foot, right?

A. I do not expect his foot -- anything below the knee to get better.

Regarding whether Dr. Patel told Mr. Jones that the surgery would involve removal of the hardware from prior surgeries, Mr. Jones testified as follows:

Q. Okay. So, indeed, Dr. Patel more likely than not did tell you about the removal of the old hardware?

A. I said he could have. It just may have been a misunderstanding, like we said.

Dr. Patel also countered with his expert's opinion that the assessment was adequate and demonstrated that he had properly discussed the surgery he would perform as follows:

22

Q. (BY [Dr. Patel's attorney]) This is the assessment from Dr. Patel's -- the second office visit with Dr. Patel prior to surgery. And under "Comments," it has that "Mr. Jones has chronic severe . . . back pain/lower extremity pain radiation concerning for bilateral L3 radiculopathy in the setting of adjacent L4 [sic] spondylosis with prior history of L5" -- "L4-[L]5, L5-S1 fusion and graft subsidence."

And that's -- you see that's accurate, right? You've seen all that, the --

A. Yes.

Q. All right. It says, "I have discussed the role of the L3-[L]4 PLIF/posterior extension of fusion/removal of old instrumentation and treatment of his low backpain and anterior thigh pain [sic] to knee . . . radiation."

Now, let's stop there. Is that description of the procedure to be performed confusing to you?

A. No.

Q. All right. . . . Plaintiff['s] [E]xpert told the jury that . . . he's not sure whether that meant [that] Dr. Patel was going to do one or the other or one side of a level or -- he was just saying that was very unclear. What's your opinion of the clarity of that?

A. When I read that, the surgery that was done and what I would be expecting to be done from reading that are -- are the same.

Q. Okay. It says, "I have discussed the R/B/A" -- and that stands for risks, benefits, and alternatives?

A. Yes.

Q. -- "of surgery including persistent pain, infection, bleeding, need for further surgery, CSF leak, nerve[-]root injury resulting in extremity weakness or numbness, hardware malfunction[,] or pseudoarthrosis."

Is that the appropriate risks that a patient should be -- that should be explained to a patient?

A. That's a pretty thorough list.

Q. All right. And it says, "He understands and wishes to proceed with surgery, all questions answered."

Again, from your review of that note, was -- did -- Dr. Patel's warning of the risks of surgery, was it done as a reasonably prudent neurosurgeon would do --

A. Yes.

Dr. Patel also claimed that he had outlined for Mr. Jones the various alternatives to surgery even though he did not specifically list them in Mr. Jones's consent and history. He claimed that he had discussed them because in his notes he had written "R/B/A": "[I]t's my practice and habit if I write 'risk/benefit/alternative' or write 'R/B/A,' then I've discussed it." Mr. Jones acknowledged that "Dr. Patel [had gone] over the risks of the surgery" and that he was aware of those risks.

Beyond Dr. Patel's assessment, Mr. Jones's medical records contain a consent form signed by Mr. Jones three days before the surgery; the consent form referenced the nature of the surgery and its risks and stated that the existing hardware would be removed. But it did not say in what order the surgery would be performed or that the order in which Dr. Patel performed it could make a difference. Specifically, the consent provided the following:

> _DESCRIPTION OF CONDITION_: I (we) voluntarily request Dr. 
>         Patel                                as my physician, and
> _name, credential (e.g. MD/DO, NP, DDS, etc.)_

24

such associates, technical assistants and other health care providers as they may deem necessary, to treat my condition which has been explained to me (us) as:

Lumbosacral spondylosis

I (we) understand that in the course of my treatment, other qualified medical practitioners who are not physicians may perform parts of my surgery, including the administration of anesthesia. I (we) understand that such qualified medical practitioners will perform only tasks that are within their scope of practice, as determined under State law and regulation, and for which they have been granted privileges by the hospital.

I (we) understand[] that physicians other than my operating physician, which may include residents, may perform tasks related to my surgery, in accordance with the hospital's policies, and in the case of residents, based on the residents' skill set and under the supervision of my physician.

*RECOMMENDED PROCEDURE*: I (we) understand that the following surgical, medical[,] and/or diagnostic procedures are planned for me[,] and I (we) voluntarily consent and authorize these procedures:

L3[-L]4 posterior lumbar inter body fusion/posterior extension of fusion with removal of old instrumentation

*RISKS AND HAZARDS*: Just as there may be risks and hazards in continuing my present condition without treatment, there are also risks and hazards related to the performance of the surgical, medical[,] and/or diagnostic procedures planned for me. I (we) understand that common to surgical, medical[,] and/or diagnostic procedures is the potential for infection, blood clots in veins and lungs, hemorrhage, allergic reactions[,] and even death. I (we) also understand that the following risks and hazards may occur in connection with this particular procedure: Pain, numbness or clumsiness, impaired muscle function or paralysis, incontinence, impotence or impaired bowel function, [u]nstable spine, [r]ecurrence, continuation or worsening of the condition that required the operation, injury to the major blood vessels[,] and hemorrhage.

Again, Plaintiff's Expert challenged the clarity of the consent because in his view the slash separating items in the form made it unclear whether Dr. Patel might be implanting new hardware or removing the old. Dr. Patel acknowledged that the consent form did not list the alternatives to surgery.

Finally, Dr. Patel's operative note contained the following entry with respect to the informed consent:

> The patient is a 47-year-old man with a prior medical history significant for L4 to S1 fusion who presented with chronic severe low[-]back pain with bilateral lower extremity pain radiation. Recent CT myelogram demonstrated adjacent L3-[L]4 spondylosis with central canal stenosis. After discussion of the risks, benefits, and alternatives of L3 to the S1 instrumentation removal, L3-[L]4 interbody fusion with extension of fusion under neuromonitoring[—]including persistent or progressive pain, infection, bleeding, need for further surgery, CSF leak, nerve[-]root injury resulting in lower extremity weakness, paralysis, or numbness, hardware malfunction or malposition, or pseudoarthrosis[—]the patient understood our discussion and asked me to schedule the surgery. Informed consent was obtained prior to performing the surgery.

> **3. We set forth the contentions that Dr. Patel's intraoperative actions breached the standard of care and proximately caused an injury to Mr. Jones.**

> **a. We explain how the surgery was performed.**

Again, the goal of the laminectomy and fusion performed by Dr. Patel was to relieve pressure on the nerves passing through Mr. Jones's spinal column by fusing the joint that had deteriorated. Dr. Patel described this surgical process as "tak[ing] that pressure -- reliev[ing] the pressure off of the sac and the nerves. And there's

26

multiple ways to do that, and one of the . . . common ways that we do that is we put interbody cages in the disc space."

As noted, Dr. Patel performed a laminectomy as part of his surgical procedure, which requires the performance of a laminotomy or removal of the lamina. The surgical process at the L3-L4 juncture where Dr. Patel operated began after he removed a "tailfin" feature of the spine called the spinous process. He then removed the lamina—"[the] arch of bone that protects the spinal canal"—by drilling progressively deeper "troughs" into the lamina to remove it. According to Dr. Patel, removal of the lamina uncovers the "spinal fluid sac and the nerve roots, [and the surgeon] can actually gently move it to either side to look at the disc underneath[] and . . . basically incise that outer ring and . . . start to remove portions of that disc."

The bilateral loss of the neuromonitoring signal occurred during the laminectomy; until that time, the equipment had registered a signal from the nerve running from the spine to the legs. After losing the neuromonitoring signal, Dr. Patel completed the rest of the surgery, which involved the placement of "cages"—the purpose of which, according to Dr. Patel, was to prevent movement in the L3-L4 joint where degeneration had caused pressure on the nerves:

> And once we get enough exposure, we can place these interbody cages, and they're actually variable as to what they're made of. Most of them are made from some sort of plastic polymer, but they can be made of titanium. They can be made of cadaverous bone. It just depends on the surgeon's preference. And they're inserted filled with one of two things, the patient's own bone, which is still living and allows that fusion to occur, or you can place it with artificial substances.

Then we do the same thing to the opposite side[:] open the ring, insert this cage after we've used things to prepare those endplates[—] those rasps that we talked about that allow stem cells to grow through your bone[—]and then we fill in that disc with your own bone graft. That, basically, is now the wedge.

And once a fusion has occurred, you can see bone has grown in this. But the only way bone can grow is with lack of movement. That lack of movement comes from screws and rods.

. . . . Now there is no opportunity for movement at this level.

Once you have that fusion across a disc space and bone has grown, there's no need for that hardware.

### b. We set forth the portion of the record involving the procedure Dr. Patel used to perform the surgery.

Plaintiff's Expert's criticisms of the surgical technique revolved around Dr. Patel's decisions (1) to first remove the hardware that had been installed at the location of Mr. Jones's prior surgeries and (2) to not then place protective devices in the L3-L4 joint where Dr. Patel was operating before performing the laminectomy.[14] According to Plaintiff's Expert, Dr. Patel's initial removal of the existing hardware at L4-L5 and L5-S1 in a spine that was already showing signs of instability at L3-L4 was problematic:

Q. Do you have an opinion about whether or not the prior hardware should have even been removed during that operation?

---

[14]Plaintiff's Expert testified that it was not a breach of the standard of care to remove existing hardware before performing additional surgery but that surgery to remove hardware is a rarity.

28

A.  There's no advantage in removing the hardware.  I've -- in my entire career, I've only removed it once, and that's when I was a resident. And in all honesty, it was because the patient had complained so much to the surgeon that the surgeon dragged me in and said, "Help me.  This is going to be a long operation.  I just need some help with removing the hardware."

There's no reason to remove hardware.[15]

Nevertheless, Plaintiff's Expert did not consider the removal of the hardware itself to be a breach of the standard of care.

But Plaintiff's Expert would not concede Dr. Patel's theory that the existing hardware was unnecessary to the continued stability of Mr. Jones's spine because the bone had already fused in the area of the prior surgeries:

Q.  Okay.  And he removes the hardware, and that doesn't add instability, right, we talked about, right?

A.  That's not what I said.  So I said *it doesn't add instability at L4-L5, L5-S1*.  [Emphasis added.]

Plaintiff's Expert described why the sequence of taking out the L4-L5, L5-S1 hardware first set up the potential for failure at other parts of the spinal structure:

The bone -- initially this bone is removed here [demonstrating on model], okay, after removal of the hardware.  And this is one of the criticisms I have of removing the hardware, is, in and of itself, it doesn't give you a complication.  What it does, however, is -- I return to the bridge example of, all of a sudden, the troughs on a bridge, on one end you say, "I'm going to loosen it here."  Well, the bridge doesn't fall

---

[15]In other words, Plaintiff's Expert thought removal of the old hardware was unnecessary:  "While I'm doing the surgery, I stay away from here [the old surgical site] if I'm just concentrating here [the L3-L4 area].  I make an incision here, hopefully operate here.  I don't get into the scar tissue.  I don't increase the chance of infection. I don't injure other areas I don't need to be [in]."

immediately, but you're setting it up for failure, and that's what can happen. It doesn't happen always. But what that patient cares about is that time and does it or does it not happen.

So you're starting to build a sequence of events that can lead to a problem.

So you disconnect and you remove this hardware. Then you come in and start removing bone.

. . . .

Q. . . . On this model, you've explained why there needed to be a bridge at the levels that he was removing, and you've shown why it's important, especially on a potentially unstable environment, to secure that before removing it.

A. Uh-huh.

Plaintiff's Expert elaborated on his opinion regarding why the "failure" had occurred; after being asked, "Show the jury with this model how he should have operated in order to maintain stability on the area involved," he testified,

The hardware would have stayed in place, and if you're concerned about instability, what you do is -- you're going to place hardware here anyway, which he did. You place the hardware first. You don't remove the bone. And similar to this rod, you put a connecting rod, which is called a temporary rod. And you keep it -- now the spine is in place. It won't move. Then you can remove the bone.

And what -- the order that was done was this was removed; no screws were placed here; then the bone was removed, which you're adding another -- now you're taking this end of the bridge and loosening the trusses on this end. You've already loosened it on this end. You've loosened it on there. In addition to that, you've added weight in the middle. What's in the middle is our bellies.

And that -- if you can imagine, this table is not a table like a bed at home. It's a table where the middle is open and our bellies fall through.

30

So what we're supported by is our shoulders here and our hips here, and everything else is like this.[16]

Thus, Plaintiff's Expert testified that before removing the existing hardware, Dr. Patel should have stabilized the L3-L4 juncture with a rod to keep it from moving after the existing hardware was removed.

He described further how the spine would move when the patient was being placed on a Jackson Table:

> When your belly falls, remember, there's enough movement -- it's physiologic movement that in an overwhelming majority of patients is okay. But you even have patients walking around that will tell you that when I bend backwards, when I bring my neck back, I get tingling in my hands. That's a sign of compression.
>
> So now you're going to lay someone down like this. Imagine laying like this or your neck back for eight hours. You could see how that nerve could get irritated in some patients. That's why you have to have the understanding, going in, is that one of those patients or is it the other patients that may not have that problem. That's where the level of suspicion needs to be at.
>
> So if your suspicion is high, even before you turn the patient, you get monitoring done and you compare it to after the turn.
>
> Overwhelmingly, we don't get the monitoring before we turn patients because most patients are okay. But if your suspicion is high, you do it.

In summary, Plaintiff's Expert opined, "It's just the sequence of events is my criticism."

---

[16]During the surgery, Mr. Jones was placed on a Jackson Table that apparently acts as a bridge to leave open the abdomen area.

31

Dr. Patel and Defendant's Expert justified Dr. Patel's decision to remove the existing hardware before performing the laminectomy. Dr. Patel testified that the hardware no longer served a purpose and could have gotten in his way while he was performing the rest of the surgery. Defendant's Expert echoed that the removal of the old hardware gave Dr. Patel a "clear path to do his surgery." In Dr. Patel's words, "There was a point of having [the existing hardware] before a fusion occurred successfully, but once fusion has occurred, you no longer require that instrumentation."

> ### c. We explain the testimony about the nature of Mr. Jones's injury.

Dr. Patel admitted that Mr. Jones had suffered a cauda equina injury and described the cauda equina as "the extension of the spinal cord. So imagine a ponytail off of your head, and the head being the bottom of the spinal cord, the cauda equina is the ponytail that floats in that tube of fluid." Dr. Patel also acknowledged that a cauda equina injury can cause the postoperative injuries that Mr. Jones experienced.

Plaintiff's Expert's position was that the injury was caused by compression. He answered, "Correct," when asked, "You're saying that with a compression at that location of L3-L4, the nerves below it would all be affected, as expected, based upon

that model and that description, in the exact manner that we see Larry Jones'[s] life having been affected?"[17]

He explained how compression injuries work:

So let's just pick one nerve here [referring to the model]. This is a two-way -- think of it as a freeway that goes in both directions. Okay?

The brain is up here. And think of the brain information to the rest of the body as opening up a hose and water coming down the hose and going out. However, there's also water coming back to the sprocket where the hose comes to. So you feel things, come in here, go to the brain. You want to move things, come from the brain and go down. So it's a two-way traffic. Okay?

And what happens if you have compression from any cause, it's -- if you've ever had your arm fall asleep on you, if you've ever laid down somewhere and it starts tingling, you immediately aren't paralyzed. You first have little sensations that don't move. It starts tingling. You start feeling differently because the compression starts adding. You're not compressing any more; it's the time that -- it adds over time. It's like taking your thumb, pointing it on a corner of the table, it immediately doesn't hurt, but if I left it there for two to three hours, it would hurt. And I'm not pressing any longer. It's the accumulation of the pressing that can cause injury.

These nerves are more sensitive. It doesn't even require hours. It can be minutes.[18] And it's taking that hose -- imagine I turn on the water and I compress it. Everything from that level down is where the water doesn't come out, and those areas would be affected.

[17]In describing the injury, Plaintiff's Expert explained, "And I think we have to differentiate between L3-L4 segment and the L4 nerve. The L -- L4 nerve would be this single nerve; it would affect a single group of muscles. The L3-L4 segment is everything from here down": the knee, medial thigh, and foot.

[18]In other words, according to Plaintiff's Expert, a nerve injury can occur over time or suddenly: "It depends on the cause of the injury. If it's a compression or crush injury, it's usually over several minutes. If it's obviously a laceration from a knife, a drill, an instrument, it's immediate."

Everything above where I pinched[19] still gets water, so the grass doesn't die. But everywhere below it, the grass dies.

And you can predict where the injury is based on where the symptoms of the patient are. So you don't need X-rays always. You don't need MRI always. You need a neurological examination, and the neurological examination can predict for you where the injury happened to a fairly close level in most cases. And independent of the imaging, you can tell by the hospital records, the medical records, and his examination most likely where the injury happened.

On redirect, Plaintiff's Expert elaborated further on how compression injuries

occur:

Q. Explain how the nerve responds to compression.

A. Think of a nerve as wires that are insulated, that are surrounded by fluid, that are surrounded by a sac, and you start pushing on it, not at a critical portion where you cut the nerve, but you push enough that the sac then pushes the fluid, then pushes the nerve. This is what happens when we start having tingling in our hands, in our feet when we sit the wrong way or lay on our hands. Then what do we do? We change the position, take the compression off, and we have no permanent damage.

If, however, that compression is continued, whether it be summation, meaning it adds up over time, or it being acute enough where the severity is high enough initially, both of those lead to irreversible injury.

So I can, for -- for an example, press 20 percent, but do it for three years, you're going to have an irreversible injury, or I can press 80 percent on it and do it within ten minutes and you may have an irreversible injury. It depends where we end up over what time period.

---

[19]From the context of later questions from Mr. Jones's counsel, it appears that on the model Plaintiff's Expert was showing pinching at the L3-L4 area.

34

At some point, the nerve loses its functional capacity. Just like a wire that may have no structural defect that you can observe, it's the functional defect. So I can take a picture of a wire going to a light bulb and it seems to be connected, but it doesn't work.

So if I take pictures of your arm, the nerves seem to be connected, but someone still may have carpal tunnel, someone still may have cubital tunnel, someone may still have a neck injury. This is why we do functional tests, which are the nerve tests. We get electricity down and see if it's functionally working or not[] because that's a better indicator, for the imaging we have nowadays, to tell us if nerves are working or not working.

. . . .

Q. If you compress a nerve, if you just -- if you squeeze on it a little bit and then you let go, does it -- does it stay compressed? I mean, can you see it compressed, or does it look like it goes back to normal?

A. It depends how much you've compressed it. If it's a slight amount of compression and you take the pressure off, it can bounce back.

But it's not like -- it's not like Play-Doh. Okay? It's not where you press on it and it stays indented. It can bounce back, and you may not see it on an MRI.

If you cut a nerve, obviously, if you crush a nerve -- and there are terms -- specific terms for these that's -- those are in trauma cases that you may see it on imaging. So it's not -- the imaging doesn't tell you if there's injury. It's the functional capacity of the nerve.

Plaintiff's Expert thus explained why an X-ray or MRI would not always show nerve damage from a compression injury.

Plaintiff's Expert also explained why Mr. Jones's existing severe stenosis made him more susceptible to a catastrophic compression injury:

In his case, going into surgery, he had so much pressure from the back from bone overgrowth, from ligament overgrowth, and from the front, from the disc, that not even injecting the dye would go to this level. So it was squeezed. It's like strangulation.

Think about it, you know, that an average person, if I just went like this, they're going to be okay. But if someone else before me had done this for five hours and they're barely breathing, me adding just a little bit may be enough to have no air flow.

This is a similar situation. He had so much squeezing to begin with that the level of air is not much; whereas, in the average person, he may have gotten away with it.

Plaintiff's Expert expressly ruled out surgical positioning as a cause of the compression:

If I have compression as a problem -- which can happen, compression, just like falling asleep on your arm. You're positioned on the table. Something starts pushing on your leg. The monitoring they're getting below that level starts changing. You take the pressure off. That's why we monitor arms while we're doing low[-]back surgery, just because your arms are up, some patients are tight, they can start getting problems in their arms. We reposition.

To suggest -- first of all, to say there was some change is an absolute inaccuracy of what happened. There was a loss.

A trash[-]can fire and a thousand-acre fire are technically both fires, but the level of severity of each, to say that they're equivalent fires would be inaccurate.

This is a complete loss. Second, it's complete loss on both sides. The possibility of both sides, both legs, being compressed at the exact same time to cause a complete loss during surgery, I've never experienced it --

Q. Is it even --

36

A.    -- to -- being compressed from positioning.   And then to suggest they just check for positioning, if you gave that answer during a board examination, you would fail the boards.   If you gave that answer that the No. 1 differential diagnosis was positioning of the legs while you're drilling on the spinal cord, then you lose both signals, and that's where you concentrate, I, as your examiner, or someone else examining me would say, "Doctor, you have failed your board examination[]" because that's not where you should be looking first.

It doesn't mean someone else can't look while you do other things.   But this is an implausible explanation of what happened.   So it's a troubling statement to -- knowing the other parts of the medical record, to say this is what happened.

He was clear that nothing other than an external compression of the nerve at L3-L4 could have caused the injury:

[T]here are no vascular diagnoses that would give you this deficit at this time.   There's no arthritis.   There's no vasculitis.   There's no -- all these different specialists Mr. Jones saw, *there is no medical condition that would give you this at this time during this surgery*.   And they came to that conclusion themselves, and they all eventually said something happened during surgery, that it was a compression.   They're not surgeons.   It's a compression.   And the ones that do a neurological examination localized it to that same level to begin with.   [Emphasis added.]

Dr. Patel acknowledged that compression is the most common cause of a cauda equina injury, but he denied he had done anything to cause the compression:

Q.   Do you know what research says is the causes of those exact symptoms you just described for any sort of cauda equina syndrome?

A.  Yes, the most common cause is extrinsic compression, usually from a disc herniation from some sort of trauma involving a hemorrhage, *something physically compressing that sac from the outside*.

Q.  Something physically compressing the sac from the outside?

A.  Correct.

Q. Exactly what you were doing?

A. I did not do that.

Q. But --

A. We relieved that pressure. We didn't cause it.

Q. You were working on that sac?

A. We were working on the sac.

Q. You were using high-speed drills and bur[r]s?

A. Correct.

Q. You -- at the exact moment in time that you were working at that specific area --

A. Yes.

Q. -- of the cauda equina injury -- and that's what he has, right? You'll agree with that?

A. Yes.

Q. And he has every symptom of it, correct?

A. Yes.

Q. And that injury was at the exact location you were operating on, true?

A. True.

Q. And he lost nerve signals at the exact time you were working on it, true?

A. Yes.

Q. With a high-speed drill, true?

A. True. [Emphasis added.]

38

### d. We set forth the portion of the record involving Plaintiff's Expert's opinion of the mechanism by which the compression injury occurred.

Plaintiff's Expert testified to three ways in which an external compression could have occurred during this particular surgery: (1) an anterolisthesis, which he described as forward movement of the vertebrae; (2) the drill's vibration on the bone at the laminectomy site, which directly touched the enlarged ligament underneath, which in turn compressed the nerve underneath; or (3) a hematoma. He said he didn't know of any "other conclusion" or "other explanation" for Mr. Jones's injury: "I don't know of a neurological condition or a vascular condition that would have led to this injury in this manner." In addition to his ruling out any vascular or other condition that could have caused the injury, he ruled out edema; a blood clot— "[Dr. Patel] didn't find a blood clot"; and, as previously noted, surgical positioning.

It was Plaintiff's Expert's theory that the coincidence between the loss of the signal while Dr. Patel was drilling the troughs was telling:

> Q. Okay. Do you think, Doctor, that it is just a coincidence of cosmic proportions that at the moment he's creating the bilateral laminotomy troughs with the high-speed drill, at the exact location of those nerves, SSEP[20] signals were lost?
>
> A. It's impossible.

---

[20]"SSEP" refers to somatosensory evoked potential and is the electrical activity of the brain that results from the stimulation of touch. *See* Somatosensory Evoked Potential, Wikipedia, https://en.wikipedia.org/wiki/Somatosensory_evoked_potential (last visited Apr. 11, 2025); *see also Mitchell v. Swanson*, No. 02-19-00460-CV, 2020 WL 6065986, at \*1 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.) (describing neuromonitoring process).

Q. So what happened, Doctor?

A. Injury happened at that level at that time.

Q. And who caused that injury?

A. It's the technical maneuvers that were preceding that.

Q. By whom?

A. The surgeon.

Plaintiff's Expert also described the process of removing the lamina. His testimony rejected Dr. Patel's contention that the presence of bone at the previous surgical site obviates the possibility of a compression occurring during the laminectomy:

> Q. They were saying the nerves are protected by the bone, so you can't possibly compress it. But you're saying today, if I'm hearing you right, Doctor, that's not true; in fact, you're drilling straight through it towards the nerve?
>
> A. Correct.

He also opined that the loss of neuromonitoring signal indicated that an intraoperative surgical injury had occurred:

> Q. And then the very next line, within the same minute, he -- [the physician reviewing the neuromonitoring] sends another note, "Please inform the surgeon, state that there is a concern for surgical injury and reposition the extremities." Why is [he] communicating that back [to the surgical team]?
>
> A. Because he has collectively put the information together that *this is not artificial, that this is not most likely from other causes, that it's most likely from an injury that has to do with the surgery itself.*

While you do that, you also reposition the -- you try to take away all the other variables. Many things are happening at the same time. [Emphasis added.]

Dr. Patel's counsel made much of the drill at trial; various points in the record deal with how and whether the use of the drill to create the laminectomy troughs injured Mr. Jones. Though much time was spent on the question of whether the drill actually impinged on Mr. Jones's nerves, in the end, Plaintiff's Expert stated, "I don't think [the injury's] from the drill."

And, when pressed, he specifically stated that he did not think the drill bit itself caused the compression injury:

Q. So this discussion about the drill causing -- being the cause of the damage here, you don't think that happened?

A. I was asked -- if I can phrase exactly what I was asked. I was asked if you take Dr. Patel at his word, could this drill have caused the injury? I said it could have, but I don't think that was the cause.

Q. Okay. So based on a *reasonable degree of medical probability*, from your review of this matter, you do not think the drill is what caused this injury?

A. *No.* That's too strong of a statement.

. . . .

A. What I'm saying is if I had the options between what I think happened and this other option, I would defer to what I think happened, but this is a possibility as well. But it's not to the point of saying that it is impossible that it happened or it's less than medical certainty or -- it's one of the possibilities, but I think this is a greater possibility, the other option.

Q. More likely than not, you believe the -- that *the drill bit* was not the cause of the nerve damage, more likely than not?

41

A. Compared to the other option, *yes.* [Emphasis added.]

But Plaintiff's Expert opined that even if the bone were not drilled through, a compression of the nerves could occur. Specifically, he used an analogy of pillows and testified that the operative record indicated that Dr. Patel had removed the surrounding bone and that the injury could have occurred by a mechanism that he described as follows:

> Someone drills, I don't touch you. If I now, however, between me and you put a lot of pillows, the ligaments get thick, it's severely compressed, I don't have to touch you to move you; I can touch this pillow, and it moves you.
>
> [Mr. Jones] had critical stenosis at that level. The ligaments were enlarged. So [Dr. Patel] doesn't directly have to touch the nerve to injure the nerve. He can touch the ligament, which pushes on the nerve. And recall that the CT/myelogram didn't even show dye going through there, let alone a drill[.]

Plaintiff's Expert was adamant that nothing other than an injury as a result of the surgery could have happened and that the reason a compression injury of any kind was able to occur during surgery was because Dr. Patel had not properly stabilized the L3-L4 area before performing the laminectomy.

In his examination of Dr. Patel, Mr. Jones's counsel emphasized that the neuromonitoring signal was lost while Dr. Patel was performing the laminectomy:

> Q. All right. So you're drilling down on that with a high-speed burr?
>
> A. No. You're drilling on the lateral -- the lamina, the gutters of the lamina with the drill, which is on the outside portion of that spinous process.

42

Q.  And that's the very next sentence, right, high-speed drill bit was used to create bilateral laminectomy troughs?

A.  Correct.

Q.  And then boom, you're notified there was [a] decrease in the bilateral lower extremity SSEPs.

Do you mention that anywhere else in your report?

A.  No.

Dr. Patel denied that he had "hit" any nerves.  He described the incremental process used to remove bone and the ligaments and fat that protects the thecal sac that contains the nerves within the spinal column, and he denied that he had compressed that sac.  Specifically, Dr. Patel testified as follows in response to a question from his counsel:

Q.  You didn't get down far enough to cause the compression because you were still shaving on the bone?

A.  That is correct.

Q.  Okay.  And you were asked repeatedly why those signals were lost, remember?  Do you remember being asked that yesterday and also today, why the signals were lost?

A. Yes.

Q.  And you said you don't know?

A. Yes.

Q.  Tell us why you don't know.

A.  Because . . . removing the thin layer of bone wouldn't cause injury to the spinal fluid sac or the nerve roots.

Q.  The mechanism just doesn't match up?

A. It doesn't match up.

Q. All right. But signals were lost?

A. They were.

Dr. Patel also suggested that if a nerve had been "hit," there would have been a spinal fluid leak.

Rather than relying on the opinion that the act of drilling caused Mr. Jones's injury, Plaintiff's Expert opined that an anterolisthesis caused the injury. Dr. Patel's counsel simplified the definition of an anterolisthesis to be that "[t]he bone went forward, which then compromised the nerves, which lost the signal, which caused all the damage." How this theory was presented to the jury is difficult to trace because Mr. Jones's counsel did not use the word "anterolisthesis" to describe this phenomenon during his examination of Plaintiff's Expert. Instead—without using the specific term anterolisthesis—counsel had Plaintiff's Expert detail why he thought Dr. Patel's surgical techniques created an instability in Mr. Jones's spine during the surgery.

The word "anterolisthesis" was first mentioned in the examination of Plaintiff's Expert during his cross-examination. After the discussion—detailed in the prior section—that it was less likely that the drill bit itself had caused a compression in Mr. Jones's spine during the laminectomy, Dr. Patel's counsel used the term anterolisthesis and asked Plaintiff's Expert if his opinion relied on the fact that the vertebrae at the L3-L4 juncture had moved relative to each other. Counsel then had

Plaintiff's Expert commit to the view that anterolisthesis was the cause of a compression that injured Mr. Jones:

Q. Okay. And anterolisthesis would be if the L3 went this way [demonstrating], right?

A. Correct.

Q. It pushes forward or slippage, maybe we could call it.

A. Uh-huh.

Q. And if this happens, then the concern then would be that the nerves might get caught or pinched or compressed?

A. At that level, yes.

Q. At that level. All right. And that's your -- that's your theory of what happened in this case, right?

A. Based on the facts and the sequence of events and the timing, yes.

Though Plaintiff's Expert doubted that the physicians who had examined Mr. Jones after the surgery performed by Dr. Patel would have been familiar with the term, he acknowledged that none of the other physicians had said that Mr. Jones's condition had resulted from an anterolisthesis. Indeed, it was Plaintiff's Expert's view that there would have been no indication of the misalignment postsurgery because Dr. Patel had "fixed" the misalignment that he had created by installing hardware as he completed the surgery.

Q. And if this happened, if this is what happened then --

A. Uh-huh.

Q. -- and you do imaging, wouldn't the imaging show this phenomena, this anterolisthesis?

A. No.

. . . .

Q. (BY [Dr. Patel's attorney]) This anterolisthesis that is your theory of what happened, there's no radiographic proof that that happened, is there?

A. There were no pictures taken. So, again, the only intraoperative picture is when a pedicle -- when an instrument is already in the pedicle. And for your conclusion that it would show it, *it's -- taking a picture is a static point in time. It shows you what you want to see when you take the picture.*

So -- and to your point, patients sometimes have anterolisthesis going into surgery. It's an indication to do surgery. You do the surgery, and it corrects the anterolisthesis. So I can correct the anterolisthesis. Just like it can occur during surgery, place the screws, bring the bone back, and correct the anterolisthesis.

That's one of the indications to do back surgery, so you will postoperatively not have anterolisthesis. But during surgery -- or the purpose of going to do surgery, you started with anterolisthesis, just like in this case -- and, actually, to get anterolisthesis, you have that bony defect. One of the ways to have anterolisthesis is some patients are born with that same defect that you create during surgery. So it is a known that you can get anterolisthesis. This is why in a high-susceptibility patient, a patient that you're keying on that they may have instability, may have anterolisthesis, you go to my earlier point of putting in a temporary rod.

Q. Now, my question, though, is, Doctor: Your theory is this anterolisthesis happened during surgery; Dr. Patel then put in the rods and the screws, which fixed the anterolisthesis, so after surgery, you wouldn't see radiographic evidence? That's what your point is, right?

A. My point is that a single picture or the picture you took does not negate the fact that there was an anterolisthesis. [Emphasis added.]

46

Anticipating Plaintiff's Expert's opposing theory, Dr. Patel testified during his earlier examination that the radiological evidence established that an anterolisthesis had not occurred and also addressed Plaintiff's Expert's view that there would be no radiological proof of anterolisthesis because Dr. Patel had fixed the condition that he had created during the surgery.

The exchange between Dr. Patel and his counsel on this point was as follows:

Q. Okay. Did anterolisthesis -- oh, and then he says -- pardon me. I've got to finish this. It went like this, and when I asked him is there any proof of this, any radiographic proof of this, he said no, because when you put the rods and pins in, it went back to normal. So it happened, but you fixed it, and so there's no evidence of it happening. Do you understand that's his position?

A. I understand that's his position, but that middle shot showed us before rods were placed, before interbody cages were placed, there was nothing keeping that spine in the correct position other than the alignment itself.

Q. Okay. Now -- so the -- again, the picture on the left-hand side of the screen --

A. Is before incision.

Q. It's before incision. All right. So then the middle screen, that is the -- the instrumentation has been taken out, right, from the other level?

A. Correct.

Q. You've already done the decompression?

A. Correct.

Q. And then you took a picture?

A. Yes.

Q. Now, if, indeed, this -- his theory is correct, you did the decompression, and we don't have the -- the third picture, you show the hardware you put back in, right, or -- or you're putting in --

A. Correct.

Q. -- that would have corrected the problem, right?

A. Yes.

Q. Then that middle photo --

A. Would have shown a slip towards the ground.

Q. Because you haven't fixed the problem yet?

A. In fact, we've invited more instability.

Q. That picture you took disproves beyond any doubt that theory against you, doesn't it?

A. Beyond any doubt.

Defendant's Expert also testified that the radiological evidence invalidated Plaintiff's Expert's theory that an anterolisthesis created by Dr. Patel caused a compression. Though Plaintiff's Expert had characterized Mr. Jones's spine as "grossly unstable" when the injury occurred and Dr. Patel decided to finish the surgery, Defendant's Expert detailed how the intraoperative X-rays established that there had not been a shift in the position of Mr. Jones's spine during the operation. He then explained that no anterolisthesis had occurred because the alignment of Mr. Jones's spine remained the same. Defendant's Expert summarized his opinion as follows:

48

[T]he important part for what we're talking about right now . . . is that the alignment here across the bottom of the vertebral body above and the top of the vertebral body below is the same after the decompression is complete.

So after he's done that decompression, there isn't an anterolisthesis. There's nothing there. I mean, there's nothing there to artificially change the alignment. The alignment is the same as it was, and -- and it doesn't change when he puts the screws in. So at no point is there a shift.

Dr. Patel's counsel then took his expert through why the radiological evidence did not support Plaintiff's Expert's opinion that Dr. Patel had caused an anterolisthesis:[21]

Q. All right. So if I can summarize here, the theory . . . Plaintiff['s] [E]xpert had was that the -- this is the back. That's the front. And the surgery is this. And so when Dr. Patel removes the spinous process and does his troughs, he's weakened this whole structure, and because he weakened it, it went like this, anterolisthesis. And when it went like this, it pinched off nerves and caused the signals to lose. That was his theory.

And when I asked him, "Well, wouldn't there be radiographic proof of that," he said, "No, because when Dr. Patel fixed it, he fixed it back like this, and so it would look normal," is what his theory was.

Well, if that's true, then, first, it goes like this, and then we took a picture -- or Dr. Patel took a picture at this point in time, and it's not like this; it's still like this, right?

A. Yes. And, actually, the third -- the third picture here, there's not a rod. The screws don't move bone by themselves. They provide an anchor point that you can pull and -- and move the bone. You could with screws reduce a spondylolisthesis[] but not without a rod. I mean,

_____

[21]As with many other parts of the record, this examination is difficult to follow as the parties refer to various exhibits, with counsel and the expert physically pointing to various aspects of the exhibits—a process that is impossible to follow from the cold record.

the screws themselves don't do it. So -- so these latter two pictures clearly demonstrate that the bone didn't move.

Q. And the third picture there, putting the screws in, we would still see the anterolisthesis, just with screws, because there's no rod?

A. Right.

Q. So did that -- do those photos there absolutely, 100 percent prove that . . . Plaintiff['s] [E]xpert's theory is just wrong?

A. I think so.

Mr. Jones's counsel narrowly challenged Defendant's Expert's opinion because the images did not reflect the time that they were taken and because there was no way to correlate them to the loss of signal recorded by the neuromonitoring. Defendant's Expert countered that what the images showed could be correlated to the operative report and the chat record that documented the loss of signal by neuromonitoring. Mr. Jones's counsel then countered that the correlation depended on accepting that Dr. Patel had accurately portrayed what procedure he was performing when there was a loss of signal. In turn, Defendant's Expert countered, "There's a lot of records and a lot of pictures and a lot of information here, and I think . . . the opinions that people have expressed, including myself, are based on all of that."

Dr. Patel's counsel also probed Plaintiff's Expert regarding whether there was radiological proof of an anterolisthesis. As with the portion of the record just set forth, this examination is similarly difficult to follow because we cannot see what exhibits were being shown or pointed to.

In essence, Plaintiff's Expert refused to concede that the X-rays that he had been shown negated the possibility that an anterolisthesis had occurred. When shown the various X-rays referred to by Dr. Patel and Defendant's Expert, and though he conceded that certain of the X-rays did not show an anterolisthesis, Plaintiff's Expert stated that there were too few X-rays to adequately portray the surgical sequence and that the anterolisthesis could have occurred in the gaps between the X-rays. At other times, Plaintiff's Expert refused to acknowledge the existence of certain physical features that Dr. Patel's counsel contended were shown on the X-rays.

At bottom, Plaintiff's Expert offered the following response to Dr. Patel's counsel when asked if there was radiological proof of anterolisthesis (phrased as spondylolisthesis in the question):

Q. What I'm -- what I'm saying is: You say there's a spondylolisthesis, and there's no radiographic proof that that existed, true?

A. I'm saying *greater than not, that is the cause of injury*. And I said earlier, could it have been the drill? It could have been the drill. Could it have been a hematoma, which he thought it could be? It could have been a hematoma.

Are all of these differentials you have to go through and take seriously when neuromonitoring? Absolutely. That's why you may assume that it is your fault. You take the signals seriously, and you do all the maneuvers to start negating all these possibilities.

Q. I didn't ask you about any of that. My question is: There's no radiographic proof of your theory, true?

A.   There would not be with these two pictures.[22]   [Emphasis added.]

When asked, "shouldn't a neurosurgeon be able to look at this op report and know what happened so that Larry Jones can -- if there's any chance for recovery, he should be able to look at this op report and say, 'I see something here; let's go look' -- 'let's go open up door No. 1'?"  Plaintiff's Expert answered, "I think by that point he's beyond recovery.  The injury has happened."

> e.   **We detail the portion of the record involving the question of whether Dr. Patel injured Mr. Jones by continuing the process of decompressing after the loss of the neuromonitoring signal.**

Another theory of negligence was that Dr. Patel had failed to properly respond to the loss of the neuromonitoring signal.  In essence, Plaintiff's Expert opined that Dr. Patel did not believe the information that the neuromonitoring loss indicated an injury and that he increased the likelihood of further injury by continuing to

---

[22]There was also a question regarding whether an injury at the location where Dr. Patel was operating would have produced the postsurgical deficits that Mr. Jones experienced.  In essence, the experts disagreed on this issue, as highlighted by a short portion of Defendant's Expert's testimony:

Q.  Plaintiffs' [E]xpert . . . said that Dr. Patel [had] damaged the L3-L4 area[] and [that] he [had] damaged it during his surgery, and that's what[] caused Mr. Jones's issues.  But the -- when you look at the records, the physical examinations done by the doctors there at the time don't support that, does it?

A.  No, there's . . . no documentation of L3 deficits after surgery.

52

manipulate Mr. Jones's nerves while completing the decompression process that was part of the surgical procedure.

Dr. Patel defended his surgical course after the loss of signal by stating that he believed the neuromonitoring loss indicated an injury and that the best course of action in that circumstance was to complete the decompression as quickly as possible. In the following exchange with his lawyer, he described his decision-making process after the signal loss, his general course of action, and his action to expeditiously complete the decompression:

> Q. At that point what do you do?  When it's no longer a technical issue, what decisions do you have to make at that point?
>
> A. When you have done all the things that you initially would in terms of blood[-]pressure management and gas management and you've taken pressure off of the limbs and the technicians have checked for placement of their needles to make sure needles haven't been displaced with the C-arm, well, that's when you have a very big choice to determine what you're going to do next.
>
> Q. Okay.
>
> A. You either stop the surgery, get the patient out if they're in a stable position, or you assume it's an actual injury.  And in that situation, that's where your training takes over[,] and that's where you actually take the pressure off that spinal sac.
>
> Q. At the point that you're told this is not a mechanical issue, it's something that could be with the human body, at that point . . . you've only gotten to the bone, right?  You haven't gotten to the thecal sac yet, right?
>
> A. Correct.

Q. So the compression that we know existed before the surgery still exists, doesn't it?

A. That is true.

Q. And so at that point, if you stop the surgery, that compression isn't fixed, is it?

A. No, it's not.

Q. And is it concerning if you have a loss of signals and compression that isn't fixed that that could be a concern for Mr. Jones at that point?

A. Yes. If you leave that pressure, that goes against all of your training. Just like when you have a stroke, time is brain, when you have loss of signals with ongoing compression, time is spinal cord, and there's a lower chance of getting any sort of recovery the longer that pressure continues.

Q. You made the decision that I'm going to decompress and . . . fix the stenosis at that point, right?

A. Yes.

Q. Now, when you're done decompressing, then is that when you would start putting the . . . screws in?

A. Yes.

Q. All right. Now, we have here that at 2:36 is when you're informed that it's not a technical issue; it's a human[-]body issue, right?

A. Yes.

Q. And then we look here, at 3:02 p.m. is when you're placing the screws, right?

A. Right.

Q. So that's a total of how many minutes? 26?

54

A. 26 minutes.

Q. 26 minutes. . . .

Now, if you would have chosen not to continue the surgery and just close up and come back another day, the problem isn't going to get fixed; the decompression isn't going to happen, is it?

A. No. That pressure would still be there.

Q. And you have to go back some other time and address that, right?

A. Correct.

Defendant's Expert described Dr. Patel's course of action as "the right thing to do." Defendant's Expert summarized his reasoning as follows:

> I mean, basically when you put the records together, his -- his response to the belief that this could probably -- I mean, again, at this time we're not sure is this an actual neurologic problem or -- or something else, but everyone is operating under the assumption that it is. And so his response to that was to complete decompression quickly[;] inspect everything visually[;] and then stabilize the segment and close in a very, very rapid fashion.

Plaintiff's Expert gleaned a different conclusion from Dr. Patel's actions after the loss of signal—that Dr. Patel did not believe the neuromonitoring's indication of a loss of signal. Plaintiff's Expert concluded that because Dr. Patel did not accept what the neuromonitoring told him, Dr. Patel had acted indifferently to it by completing the surgery, which required the manipulation of Mr. Jones's spine in a way that exacerbated the injury. Plaintiff's Expert's opinion regarding Dr. Patel's rejection of the accuracy of the loss of signal took the following form:

Q.  And the reaction [of Dr. Patel] here was to continue performing the operation?

A.  Correct.

Q.  Okay.  So what does that indicate to you, based upon all reasonable medical probability, with respect to what Dr. Patel was thinking at that time when he got the bilateral complete signal loss?

A.  Part of this is, if I just had those records, I'll have one answer.  The cross -- the -- I forget the term.  The deposition we gave, the opposing side gave me additional information, so I have that information.  It's a different answer.  So it's depending on at which angle.

If it's just this information, what it suggests to me is that he doesn't think that thermometer is real.  He doesn't believe that that temperature in the room is accurate, so I'm going to continue the surgery.  So the monitoring is not accurate, so I continue the surgery.

In turn, Plaintiff's Expert opined on the consequences of what he viewed as

Dr. Patel's disbelief of the accuracy of the loss of signal:

Q.  (BY [Plaintiff's attorney])  You -- You know the deposition.  You've seen all the records.  What is that opinion?

A.  Well, they alluded to the fact that he continued to remove the bone so that there would be less pressure or if there was a blood clot there, which neither of which he found -- or he didn't find a blood clot.  That's okay for that stage.  But then you continue the surgery, so you start moving the nerves.

So, remember, for me to remove the bone here and get here, which is where I need to get to, to put the grafts, I have to move this blue stuff over both ways.

So imagine a broken arm.  Is it going to heal better or worse if someone moves it?  It's going to heal worse.  You have potentially injured a nerve, and now I'm moving that nerve for a significant amount

of time to do other parts of the surgery, as if it's not injured. So the likelihood of injury increases.

Not only that, the time spent -- remember, this is all about time. I fall asleep on my arm, it's not paralyzed. I fall asleep for three days, it could be paralyzed.

Accelerate that up for this injury. I waste two hours doing other parts of the surgery, that can have a greater likelihood of injuring those nerves, and I move them, in addition. I can have a greater injury probably of doing those nerves -- or injuring those nerves. So those events add up.

But on cross-examination, Plaintiff's Expert conceded that although he disagreed with the sequencing of Dr. Patel's surgical course, the decompression that Dr. Patel performed needed to be done:

Q. So -- and you know that's what Dr. Patel did; he completed the decompression after determining that the neuromonitoring was true and [that] there wasn't a technical issue, right?

A. That's one of the things he did, yes.

Q. All right. And he placed rods or screws and rods, right?

A. He placed screws first.

Q. Screws first, and then he put a cage in there, each side, right?

A. Correct.

Q. All right. And he put the bone growth in there, the stuff that -- to -- did he just place a cage, or did he do something in addition to placing the cage?

A.  I think he used the patient's autologous bone and some bony artificial material, but I don't think he used BMP.[23]

Q.  Okay.  We saw the video yesterday as far as the cage being placed and the material being put around so it would help --

A.  Yes.

Q.  You know that's what I was talking about, right?

A.  Do I know what?  I'm sorry.

Q.  That's what I was referring to, putting the cage in there --

A.  Yes.

Q.  -- and the other material.

A.  Yes.

Q.  All right.  And you agree decompression needed to be done at that point?

A.  You started down a path of removing screws.  You've taken one truss off of L4.  I have nothing to support that segment anymore.  So I don't agree that it had to be done.  It's the steps that were -- decisions that were made, and now there's an increased likelihood of complications.  If those screws remained in place at L4, you could have placed screws at L3, put a temporary rod, distracted, stabilized that segment, and then decompressed.

Q.  Okay.  I didn't ask you that, Doctor.  I asked you --

A.  Then the answer is, no, I do not agree that the decompression needed to be done at that moment.  I would have placed screws at L4, which were already -- the holes were there.  It would have taken 20 seconds.  I would have placed screws at L3, distract it after placing a temporary rod, then completed my decompression.  And the time to do

[23]"BMP" stands for bone morphogenetic protein.  *See* BMP, Wikipedia, https://en.wikipedia.org/wiki/Bone_morphogenetic_protein (last visited Apr. 8, 2025).

that on one side would have been about 45 seconds to a minute and a half.

Q. You would have completed decompression? Is that what you just said?

A. At some point I would have. Just not in that order.

Q. Okay. And my question was that you would do the decompression. I didn't ask you about order, Doctor.

A. You asked -- you said you would do that next.

Q. Do the -- the decompression. Okay.

A. That wouldn't be my next move. That's what I'm trying to relay to you, is it wouldn't have been my next move.

Q. If it's compressed, it needs decompressed, right, something to --

A. Sure. Sure.

Q. All right.

A. Sure.

Q. Now -- and, granted, you would have done it in a different order, but the bottom line is decompression needed to be accomplished at that point?

A. At -- even before surgery. It's one of the goals of surgery. So going in, you had to decompress.[24]

---

[24]Dr. Patel was asked if he should have administered steroids to Mr. Jones when there was a loss of the neuromonitoring signal. The records do not show the administration of steroids at that time, and Dr. Patel could not testify that steroids were administered. He also said that he could not see a benefit of giving steroids at that point. Plaintiff's Expert did not mention steroids during his testimony. Defendant's Expert was asked about the portion of Plaintiff's Expert's report that noted that the administration of steroids was one of the six things that should have been done; Defendant's Expert stated that he did not agree that the use of steroids

### f. We set forth the portion of the record involving the question of whether Dr. Patel should have performed a wake-up test on Mr. Jones.

Approximately half an hour after the loss of the neuromonitoring signal, the neurophysiologist who was remotely monitoring the signal suggested a wake-up test. The record indicates that only a single suggestion of a wake-up test was made. A wake-up test would have required bringing Mr. Jones out of anesthesia to see if he could wiggle his toes. Dr. Patel considered and rejected the suggestion of doing a wake-up test.[25] Dr. Patel concluded that the wake-up test was not in Mr. Jones's best interest "[b]ecause regardless of what [was] found, that pressure would have continued, and his best chance of recovery [was] to get that pressure completely off." In addition, conducting the wake-up test would have extended the time of the surgery. Dr. Patel testified that a wake-up test presents another danger because the patient's breathing tube can become dislodged, which he testified can have disastrous consequences. In his mind, it was not a close call to forgo the test with Mr. Jones because its risks outweighed its benefits.

Defendant's Expert opined as well that it would have been inappropriate to perform a wake-up test at the time it was suggested. Defendant's Expert reiterated

---

was within the standard of care because the detriments outweighed the benefits of steroid use. The other steps that Plaintiff's Expert stated should have been performed were done.

[25]Apparently, during his deposition, Dr. Patel answered that he could not say that if he had performed a wake-up test that Mr. Jones would still be able to walk.

Dr. Patel's reasoning that a wake-up test would only have extended the surgery without providing any additional useful information. The test would have only served to confirm to Dr. Patel that there was a problem when he was already operating under the assumption that the neuromonitoring had demonstrated a physical problem, and waking up the patient would not have given any additional information regarding where in Mr. Jones's spine the loss of signal had originated. Finally, Defendant's Expert agreed that a wake-up test can have fatal consequences by dislodging the breathing tube.

Counsel for Dr. Patel and Plaintiff's Expert argued repeatedly throughout Plaintiff's Expert's testimony regarding whether he had conceded that no wake-up test was needed. Plaintiff's Expert conceded that if Dr. Patel had believed the neuromonitoring's report of a loss of signal, there was no need to do a wake-up test. As Plaintiff's Expert explained when asked if the wake-up test would "have done potentially any good," the wake-up test could have confirmed that a loss due to injury had occurred but would not have changed the fact that an injury had occurred:

> It would have told you that the -- so there are two ways of approaching this. One is either you believe the monitoring, which you don't need to do a wake-up test, or you don't believe the monitoring and you want to say, "Prove to me that the monitoring is real," and the only way to do that is I'm going to wake the patient up during the surgery and see if [he] can move [his] legs, because if [he] can, then the monitoring is not real. And if [he] can't, then the monitoring is real.
>
> So you're telling me: Is this thermometer accurate or not? Either I hand you a new thermometer, wake the patient up, or I believe that thermometer.

None of those two maneuvers change the temperature in the room. It doesn't change the injury. It just tells you whether it is real or not real.

Indeed, Plaintiff's Expert acknowledged the dangers of a wake-up test, such as potentially dislodging the breathing tube and causing internal bleeding. What Plaintiff's Expert would not concede was that there was no need for a wake-up test if in doing so he was also required to concede that Dr. Patel had trusted that the neuromonitoring signal had revealed a real finding of a neurological loss. Plaintiff's Expert remained steadfast, "I'm telling you the sequence of events [doesn't] suggest that he believed it[] because if you believe that . . . the monitoring is real, you don't do all these extra steps afterwards that can injure the nerves more."

> **4. We set forth the portion of the record involving the question of whether Dr. Patel's postsurgical care of Mr. Jones breached the standard of care.**

When examined in recovery after surgery, Mr. Jones could not move his feet. He remained in the hospital for nine days after surgery before being transferred to an inpatient rehabilitation facility. During this period, Dr. Patel consulted with a number of other physicians who examined Mr. Jones. These consultations included a vascular surgeon and another neurologist. Though the parties argued back and forth as to what the consultants found, none of the consulting physicians were able to "figure . . . out" why Mr. Jones exhibited the postoperative symptoms that he did.

In addition, imaging and various tests were performed on Mr. Jones. Though the radiological interpretation suggested that there was some restriction or pressure on

the nerves at the L3-L4 level, Dr. Patel testified that postoperative imaging did not reveal a compression where he had operated on Mr. Jones.

After several postsurgical visits, Dr. Patel referred Mr. Jones to another hospital for additional examination and consultation. The additional consultation did not yield any results regarding "how this [injury] happened."

Plaintiff's Expert was critical of Dr. Patel's postoperative care, but that criticism was of a narrow scope. Plaintiff's Expert summarized his opinion as follows:

> After the operation or after the complication, part of it, he referred to a lot of doctors, a lot of imaging, acquired appropriate imaging, but the immediate -- immediately after the injury, not relaying that to the family, not saying the severity of it, not relaying that in the operative record is not ordinary care.

Plaintiff's Expert supported his opinion by criticizing Dr. Patel's postoperative note that described "a bilateral complete [neuromonitoring] loss" as "some decrease in the bilateral" signal. In essence, Plaintiff's Expert opined that there was no reason not to include in the report that a total loss had occurred, and he implied that the failure indicated a cover-up by Dr. Patel. Specifically, Plaintiff's Expert said that the deficiency in the operative report prevented the vascular surgeon from knowing what he needed to know to treat Mr. Jones postoperatively. But Plaintiff's Expert also acknowledged that at that point in the consultation, Mr. Jones was beyond recovery.[26]

_____

[26]Plaintiff's Expert also testified that a vascular diagnosis would not account for Mr. Jones's deficit and articulated why he held that opinion. Plaintiff's Expert also discounted other causes, such as edema or "other sort[s] of blood issues."

63

When asked by Dr. Patel's counsel about the specific postoperative care that Mr. Jones had received, Plaintiff's Expert failed to identify any aspect of the care that had injured Mr. Jones but emphasized again that the consultations and studies were not going to reveal the cause of Mr. Jones's injury:

Q. Now, Dr. Patel then, after surgery, he saw -- as you know, he saw Mr. [Jones] every day in the hospital? Nine days straight, he saw Mr. Jones, right?

A. Correct.

Q. And he called in a neurologist as a consultant, right?

A. He did.

Q. Yeah. That's appropriate, isn't it?

A. Sure.

Q. And if he's trying to figure out what's happening with the patient, hi[s] calling in other specialists isn't inappropriate, is it?

A. It's not inappropriate. It's implausible that it would have been in the differentials that were proposed.

Q. Okay. But to answer my question, it's not inappropriate, is it?

A. I don't know of a neurological condition or a vascular condition that would have led to this injury in this manner. So is it --

Q. My question --

A. -- is it improper? You can get a neurology consult to confirm a neurological examination, to get a confirmation that your exam is accurate, to get a second opinion that the exam is accurate. If that's the purpose, sure. Remember, the indications for the consult are not stated.

However, if you're getting the consultation to say, "Look, I don't know what happened; it must be these causes," that is improper[] because it is not those causes, and it is implausible to say that vasculitis or psoriasis caused this person's injury.

Q. Your opinion with respect to Dr. Patel's postoperative actions in getting the various consultants, you saw a genuine -- a genuineness in Dr. Patel trying to do as much as he could postoperatively?

A. Correct. And I alluded to that earlier, that after surgery, by and large, he was trying to be complete and trying to investigate what [had] happened.

Q. He is attempting a -- to -- an exercise to determine what had happened, right?

A. I don't know his -- his mindset. I just know the consultations received.

I think he was being thorough in the imaging is largely what I referred to, in the studies, the EMGs, the CAT scans, the MRIs.

The actual consultations predictably were not going to lead to a conclusion of what happened during surgery.

Both Dr. Patel and Defendant's Expert defended Dr. Patel's postoperative care. Defendant's Expert disagreed that the consultations were a waste of time and offered the following opinion of Dr. Patel's postoperative care:

Q. (BY [Dr. Patel's attorney]) First, what's your opinion on, one, Dr. Patel's efforts to try to -- his approach to try to figure out what's going [on] with Mr. Jones and why he's in the condition he's in and, two, . . . referring him to a medical institution like U.T. Southwestern in those efforts?

A. It's an extremely thorough workup. I mean, he didn't leave any stone unturned. And when he could think of any stones to look under, he sent the patient somewhere else hoping they'd find something. It didn't work.

### III. Sufficiency Analysis

#### A. We set forth the legal-sufficiency standard of review.

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining whether legally sufficient evidence supports the challenged finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

#### B. We set forth the factual-sufficiency standard of review.

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that

the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). If reversing for factual insufficiency, we must detail the evidence relevant to the issue in consideration and clearly state why the finding is factually insufficient—that is, why the evidence supporting the finding is so weak or is so against the great weight and preponderance of the evidence that the finding is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Pool*, 715 S.W.2d at 635.

**C.** **We explain how the standard of care, breach of the standard, and causation are established in a medical-malpractice case.**

A medical-malpractice claim is a species of negligence and requires a plaintiff to establish "the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *Windrum v. Kareh*, 581 S.W.3d 761, 768 (Tex. 2019). Broadly, the existence of a duty and its breach are established as follows:

> To establish breach of a duty, the plaintiff must establish an applicable standard of care. *See generally Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404–05 (Tex. 2009); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879–80 (Tex. 2001). In a medical[-]malpractice negligence case, the standard of care is what a doctor of ordinary prudence in that particular field would or would not have done under the circumstances. *See James v. Brown*, 637 S.W.2d 914, 918 (Tex. 1982) . . . . "Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880.

*Id.*

The principles that govern causation in a medical-malpractice suit are well-established:

> Ordinarily, to recover for medical malpractice, a plaintiff must prove "to a reasonable medical probability that the injuries complained of were proximately caused by the negligence of a defendant." The two elements of proximate cause are cause-in-fact and foreseeability. A defendant's negligence is the cause-in-fact of a plaintiff's injury if "(1) the negligence was a substantial factor in causing the injury, and (2) without the act or omission, the harm would not have occurred." Courts refer to these two components as "substantial factor" causation and "but for" causation.
>
> . . . .
>
> In a typical medical[-]malpractice case, the plaintiff must adduce evidence that the defendant's negligence was a substantial factor in causing the injury and that, but for the defendant's negligence, the plaintiff would not have been injured.

*Pediatrics Cool Care v. Thompson*, 649 S.W.3d 152, 158 (Tex. 2022) (footnotes omitted). In other words, plaintiffs in medical-malpractice cases "are required to adduce evidence of a 'reasonable medical probability' or 'reasonable probability' that their injuries were caused by the negligence of one or more defendants, meaning simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Bustamante*, 529 S.W.3d at 456.

As our factual summary has described, Plaintiff's Expert opined that Mr. Jones was injured through a series of preoperative and intraoperative missteps made by Dr. Patel. Dr. Patel defended by attacking each specific alleged misstep that Plaintiff's Expert outlined, and as we detail below, he carried that approach forward into his

68

appellate brief. Mr. Jones argues that this approach is an invalid attempt by Dr. Patel to divide and conquer. In essence, Mr. Jones asks us to look at the concurrent effect of the history of Dr. Patel's treatment of Mr. Jones and argues that the aggregate shows that Dr. Patel's compounding failures were a substantial factor in Mr. Jones's injuries even though each individual misstep in his care, standing alone, may not have been a but-for cause.

To support this view, Mr. Jones analogizes his case to recent supreme court opinions that examine causation in the context of the concurrent negligence of multiple health care providers and how that factual scenario impacts the interplay of the but-for and substantial-factor aspects of causation. The principle that Mr. Jones argues that we should derive from these cases is as follows:

> In those cases, when the plaintiff could not isolate a specific act of one particular physician [who] caused his injuries, the court found causation by examining the acts of multiple physicians in the aggregate. Likewise, in this case, causation is established even if there is no single act by Dr. Patel that, in isolation, caused [Mr.] Jones's injuries—as long as there is evidence that [Mr.] Jones would not have suffered his injuries but for the aggregate effect of Dr. Patel's negligent acts and omissions.

The most recent supreme court opinion to examine the dynamics of causation when dealing with concurrent acts is *Pediatrics Cool Care*, which involved care by a number of health care providers to a teenager who ultimately committed suicide. 649 S.W.3d at 154. The supreme court reviewed an opinion by the court of appeals that had omitted an analysis of whether the acts established but-for causation. *Id.* The

69

supreme court rejected the court of appeals's holding as a misreading of the supreme court's prior precedent. *Id.*

The supreme court offered the following detailed analysis of the interplay of the causation components when dealing with concurrent causes from different providers:

> Citing our decision in *Bustamante v. Ponte*, the court of appeals disregarded the cause-in-fact analysis applied in *Providence*[27] and *Rodriguez-Escobar*,[28] instead announcing that it would "apply the substantial factor test[]" to the exclusion of requiring but-for causation. In *Bustamante*, we rejected "a stringent but-for causation test" for an individual actor when the evidence demonstrates that concurrent acts of negligence combined to cause the injury. *Bustamante*, however, did not eliminate but-for causation for medical[-]malpractice cases involving multiple negligent actors. Rather, when the facts establish that concurrent causation exists for multiple negligent actors—each whose negligence is itself a but-for cause of the injury in question absent the others' concurrent negligence—then the but-for requirement shifts from the individual level to the aggregate level of defendant tortfeasors.

> *Bustamante* concerned a premature infant who had a 90% to 100% chance of developing retinopathy of prematurity, an abnormal blood-vessel growth pattern that can cause diminished vision or blindness. Experts testified that a properly screened and diagnosed infant would have received a laser therapy that was "successful in over 75% of 'all comers'" and, when timely, prevented retinal detachment in almost 90% of eyes studied. The failure to timely diagnose and treat the infant's retinopathy lay equally on two physicians, Dr. Ponte and Dr. Llamas, and a jury found both responsible. A divided court of appeals reversed, holding that there was no evidence that either physician's negligence was a but-for cause of the infant's injuries because the other physician's negligence also contributed to causing the injury. "Specifically, the court of appeals criticized [the expert] for testifying that it was 'more likely

---

[27]*Providence Health Ctr. v. Dowell*, 262 S.W.3d 324, 329–30 (Tex. 2008).

[28]*Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 114–15 (Tex. 2013).

than not' [that the infant] would have a sighted life if not for Dr. Ponte's and Dr. Llamas's combined negligence, rather than quantifying the negative impact of each negligent act."

Our Court held that the court of appeals [had] erred in applying "a stringent but-for causation requirement in a case that should have been resolved under the substantial-factor test." Because both physicians had failed to diagnose and treat the retinopathy, it was impossible to say that, but for the actions of either physician, the infant would have a sighted life. The evidence of but-for causation was nonetheless present at the aggregate level—but for the *combined* negligence of Dr. Ponte and Dr. Llamas, the infant more likely than not would have a sighted life. And, had either physician acted alone, his negligence in failing to diagnose retinopathy would have been a cause-in-fact of the injury.

This case also presents multiple defendants. If the negligent acts of each provider are so concurrent that they cannot be examined in isolation, the correct approach is to consider whether each provider's individual negligence was a substantial factor in [the teenager's] death *and* whether the providers' combined negligence was a but-for cause of [the teenager's] death. The court of appeals erred in eliminating a but-for causation requirement.

The parents further argue that our decision in *Windrum v. Kareh* suggests that *Bustamante* eliminated but-for causation in medical negligence cases involving multiple actors. In *Windrum*, we rejected the court of appeals'[s] reliance on the physician's failure to diagnose and treat not being the "immediate" cause of death to demonstrate that substantial-factor causation was lacking. Instead, we held[ that] "the proof required is that the negligence be a substantial factor, not that it be the 'immediate cause.'" Contrary to the parents' suggestion, however, our Court required but-for causation: "The ultimate question, then, 'is whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm *and without which the harm would not have occurred*.'" We have not eliminated but-for causation; we do not do so today.

*Id.* at 159–61 (footnotes omitted).

71

Based on this explanation, we reject Mr. Jones's premise that we may dispense with the question of but-for causation. Mr. Jones thus carried the burden of establishing that at least a breach of the standard of care by Dr. Patel was a but-for cause of the injury that he suffered.

And even if there were an argument that the standard of but-for causation had been lessened, it was not lessened in the trial court's charge, which instructed the jury as follows: "'Proximate cause,' when used with respect to the conduct of [Dr. Patel], means a cause that was a substantial factor in bringing about an occurrence, and *without which cause such occurrence would not have occurred.*" [Emphasis added.]

### D. We set forth the standards for determining whether a plaintiff has presented viable expert testimony in a medical-malpractice suit.

Proof of a breach of duty and causation for a medical-malpractice claim requires expert testimony. *Windrum*, 581 S.W.3d at 768. Thus, medical-malpractice cases are often battles of the experts. *Gunn*, 554 S.W.3d at 665. If the parties offer viable expert testimony,

> jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. *City of Keller*, 168 S.W.3d at 819. It is the province of the jury to resolve conflicts in the evidence, and when reasonable jurors could resolve conflicting evidence either way, we presume they did so in accordance with the verdict. *Id.* at 820.

*Id.*

But for the battle to be joined, each side must present viable expert testimony; the battle is not joined if an expert's testimony is conclusory. Determining the fine

72

line between viable and conclusory expert testimony—a determination that we must make when refereeing the expert battle—is encapsulated by the following quote from the supreme court:

> The line determining whether an expert opinion is conclusory is difficult to draw, and "[c]lose calls must go to the trial court." *See Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006) . . . . But when the evidence falls within the zone of reasonable disagreement, the court may not substitute its judgment for that of the [factfinder]. *See City of Keller . . .*, 168 S.W.3d [at] 822 . . . ; *see also* [*Golden Eagle Archery, Inc. v.*] *Jackson*, 116 S.W.3d [757,] 761 [(Tex. 2003)] (stating that "a court must not merely substitute its judgment for that of the jury[]" and [that] "the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony"). If "the evidence compels the jury to guess if a vital fact exists, a reviewing court does not undermine the jury's role by sustaining a no-evidence challenge." *Jelinek*[ *v. Casas*], 328 S.W.3d [526,] 538[ (Tex. 2010)].

*Windrum*, 581 S.W.3d at 770. Thus, should we determine that an expert's opinion is conclusory, it constitutes no evidence. *Id.* Unlike in a situation in which an expert's opinion is unreliable or inadmissible, there is no requirement to make a trial objection to contend that an opinion is conclusory. *Id.*

In deciding whether an expert's opinion in a medical-malpractice case is conclusory, we are guided by the following roadmap from the supreme court:

> A conclusory statement asserts a conclusion with no basis or explanation. *See* [*City of San Antonio v. Pollock*, 284 S.W.3d 809,] 818[ (Tex. 2009)]; *see also Bustamante*, 529 S.W.3d at 462 (explaining that "[a]n expert's testimony is conclusory if the witness simply states a conclusion without an explanation or factual substantiation"). Bare or baseless opinions cannot support a judgment, even if there was no objection over their admission into evidence. *See Pollock*, 284 S.W.3d at 816. An "expert must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex.

73

1999); *see also Jelinek* . . . , 328 S.W.3d [at] 536 . . . ("It is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury. The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury.").

"[I]t is the basis of the [expert] witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law . . . ." *Pollock*, 284 S.W.3d at 816 (citations omitted); *see also Palacios*, 46 S.W.3d at 876 (noting that "Texas courts have long recognized the necessity of expert testimony in medical-malpractice cases"). Mere evidence of the injury coupled with an expert's opinion that the injury might have occurred from the doctor's negligence has no tendency to show that the doctor's negligence caused the injury. *See Jelinek*, 328 S.W.3d at 536 (quoting *Hart v. Van Zandt*, 399 S.W.2d 791, 792 (Tex. 1965)). And the mere *ipse dixit* of the expert—that is, asking the jury to take the expert's word for it—will not suffice. *See Pollock*, 284 S.W.3d at 816; *see also Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 806 (Tex. 2006) (explaining that testimony is fundamentally unsupported when "the only basis for the link between the [expert's] observations and his conclusions was his own say-so" (citing *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 912–13 (Tex. 2004) (Hecht, J., concurring))). An expert cannot provide the jury with unexplained conclusions or ask the jury to "take his word for it" because of his status as an expert. *See Arkoma Basin Expl. Co. . . . v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 389 (Tex. 2008).

In short, under the well-established case law of this Court, an expert's statement or opinion is conclusory when[] (1) he asks the jury to take his word that his opinion is correct but offers no basis for his opinion or the bases offered do not actually support the opinion; or (2) he offers only his word that the bases offered to support his opinion actually exist or support his opinion. *See Jelinek*, 328 S.W.3d at 536; *Pollock*, 284 S.W.3d at 816; *Mendez*, 204 S.W.3d at 801; *see also Hart*, 399 S.W.2d at 797 (holding that the expert testimony presented a question of fact upon which reasonable minds could differ and that "[i]t is not for this Court to decide whether . . . [the doctor's] . . . failure to perform surgery . . . was in fact negligence proximately causing [the] injuries. Rather it is for this Court to decide whether or not the evidence in the record presents facts which must be passed upon by the jury").

*Id.* at 768–69.

The requirement that an expert adequately explain the basis for his opinion is pivotal when the expert's opinion is based on circumstantial evidence:

> When the only evidence of a vital fact is circumstantial, the expert cannot merely draw possible inferences from the evidence and state that "in medical probability" the injury was caused by the defendant's negligence. The expert must explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts. Thus, when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the [factfinder] why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion. *See Lenger*[ *v. Physician's Gen. Hosp.*], 455 S.W.2d [703,] 707[ (Tex. 1970)] ("[E]xpert testimony that the event is a possible cause of the condition cannot ordinarily be treated as evidence of reasonable medical probability except when, in the absence of other reasonable causal explanations, it becomes more likely than not that the condition did result from the event."); *Hart*, 399 S.W.2d at 792 ("The burden of proof is on the plaintiff to show that the injury was negligently caused by the defendant[,] and it is not enough to show the injury together with the expert opinion that it might have occurred from the doctor's negligence and from other causes not the fault of the doctor. Such evidence has no tendency to show that negligence did cause the injury.").

*Jelinek*, 328 S.W.3d at 536.

> **E.    We will address Dr. Patel's legal-sufficiency challenge first because it seeks the broadest relief, and we conclude that there is legally sufficient evidence to support the jury's finding that Dr. Patel was negligent and that his negligence was a proximate cause of Mr. Jones's injury.**

Dr. Patel raises both legal- and factual-sufficiency challenges to the jury's answer to charge question number one, in which the jury found that Dr. Patel's

75

negligence proximately caused the injuries in question. Because the legal-sufficiency challenge would accord Dr. Patel broader relief, we address that issue first:

> Generally, when we sustain a legal-sufficiency issue, we must render judgment for the appellant because that is the judgment the trial court should have rendered. *See AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 595 (Tex. 2008) (sustaining challenge to legal sufficiency of evidence and rendering take[-]nothing judgment); *Vista Chevrolet, Inc. v. Lewis*, 709 S.W.2d 176, 176 (Tex. 1986); *EAN Holdings, LLC v. Arce*, 636 S.W.3d 290, 295 (Tex. App.—Fort Worth 2021, pet. denied). Finally, when a party presents multiple grounds for reversal, we decide rendition issues such as legal[-]sufficiency challenges before remand issues such as factual[-]sufficiency challenges. *See* Tex. R. App. P. 43.3; *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999) . . . ; *Altice v. Hernandez*, 668 S.W.3d 399, 409 (Tex. App.—Houston [1st Dist.] 2022, no pet.).

*Chamblee Ryan, P.C. v. JBS Carriers, Inc.*, 691 S.W.3d 797, 809 (Tex. App.—Tyler 2024, pet. denied).

As noted above, the standard of review for a legal-sufficiency analysis requires that we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not and indulge every reasonable inference that supports the attacked finding. *Cent. Ready Mix Concrete*, 228 S.W.3d at 651. As we have also noted, evidence that is conclusory constitutes no evidence. Viewed through the narrow prism of a legal-sufficiency analysis, we conclude that there is some evidence that Dr. Patel's preoperative and intraoperative treatment of Mr. Jones failed to meet the standard of care and caused his injury. Our conclusion in this regard is targeted and does not require the lengthy analysis that usually follows when examining factual sufficiency.

76

Dr. Patel makes many attacks that undermine Plaintiff's Expert's conclusions on the numerous breaches of the standard of care alleged by Plaintiff's Expert, but in adhering to the standard of review, we view those attacks as falling more aptly within a factual-sufficiency analysis because we hold that the evidence is not conclusory and therefore legally sufficient as to one of the alleged intraoperative breaches; thus, whether evidence relevant to the other alleged breaches is legally and factually sufficient is not dispositive. Specifically, Plaintiff's Expert analyzed Dr. Patel's failure to plan and implement a proper surgical procedure in light of Mr. Jones's known physical history and established the dangers that his condition presented for the way in which Dr. Patel performed the surgery.

Mr. Jones's brief encapsulates his argument regarding why the record is sufficient to sustain the jury's finding as follows:

> [T]here is no need for the court to examine Dr. Patel's granulated version of [Mr.] Jones's negligence claim[] because [Plaintiff's Expert] also testified repeatedly that it was the entire "sequence of events" leading up to Dr. Patel's decision to perform the surgery, and his actions during and after surgery, which form the basis of [Mr.] Jones's negligence claim. Those acts and omissions revealed both a general sense of "not appreciating the severity of [Mr.] Jones's condition and then failing to undertake the necessary steps during the surgery to address Mr. Jones's condition." The jury heard evidence that Dr. Patel (1) breached the standard of care of a neurosurgeon pre[]operatively, intra[]operatively, and [postoperatively], and (2) that those breaches were a cause of [Mr.] Jones's injuries, including permanent paralysis. [Footnotes and record references omitted.]

We have exhaustively outlined the record in this case and will not repeat the same level of detail. As we have noted, it was Plaintiff's Expert's premise that the

pivotal aspect in any back surgery is the planning based on the patient's history—not the actual surgery itself. Though the bases for his conclusions as to certain distinct breaches were somewhat undermined, Plaintiff's Expert outlined a number of steps that he concluded were necessary to properly plan Mr. Jones's surgery in light of the state of his spine, which had been weakened by prior surgical procedures. Plaintiff's Expert's specific criticisms revolved around Dr. Patel's failures, such as his failure to review Mr. Jones's prior medical records and failure to obtain timely flexion and extension X-rays. But a more general theme was that in view of Mr. Jones's history, of which Dr. Patel was aware, his spine held the potential for instability once the surgery began, and Dr. Patel's planning for the sequencing of the surgery did not adequately account for that.

In essence, Plaintiff's Expert opined that Dr. Patel had introduced instability into Mr. Jones's spine by removing hardware left by the prior surgeries as the initial step of the surgery and that this left Mr. Jones's spine in an unstable state when Dr. Patel began the process of performing the laminectomy associated with the decompression of the L3-L4 juncture of the spine. According to Plaintiff's Expert, Dr. Patel should have first stabilized the L3-L4 area by placing a rod at that juncture, which would have prevented movement there while he was operating.

And there was no dispute that the loss of the neuromonitoring signal occurred at the time that Dr. Patel was operating at the juncture that Plaintiff's Expert claimed was set up for failure by the sequencing of the surgery. Indeed, even Dr. Patel

78

conceded that the loss of signal occurred when he was conducting the laminotomy at that location. Plaintiff's Expert accounted for the loss by opining that an injury occurred at this moment either because the surgical technique itself caused further impingement on the nerves or caused the unstable spine to shift, further compressing the nerve or nerves; Plaintiff's Expert stated that it was his primary theory that the injury had occurred because of the shifting.

Dr. Patel's brief tries to sidestep this criticism of his surgical technique by a characterization of Plaintiff's Expert's testimony that unduly cabins the expert's opinions:

> To be clear, [Plaintiff's Expert] did not criticize Dr. Patel's surgical technique from the initiation of surgery until the time of signal loss. The issue, according to that expert, was how Dr. Patel responded to the signal loss. But whatever surgical maneuver Dr. Patel performed that caused the loss of signal was not the subject of [Plaintiff's Expert's] criticisms. [Plaintiff's E]xpert postulated that something caused compression but never explained the possibility that whatever occurred might have *been* the injury. [Record references omitted.]

Based on our outline of the record, we disagree with the premise that Plaintiff's Expert failed to challenge the surgical technique that Dr. Patel had used before the signal loss.

Dr. Patel attacks many aspects of Plaintiff's Expert's opinions as being conclusory. Here, Dr. Patel does not make that attack about the sequencing of the surgery as he sidesteps the opinion. Even so, we do not view the testimony regarding this aspect of Dr. Patel's surgical performance as being conclusory. In essence, an

opinion is conclusory when "[m]ere evidence of the injury coupled with an expert's opinion that the injury might have occurred from the doctor's negligence has no tendency to show that the doctor's negligence caused the injury." *Windrum*, 581 S.W.3d at 768–69. And again, to determine whether an opinion is conclusory requires fine-line drawing. *Id.* at 770. Plaintiff's Expert supported his conclusion—at least to the extent of noting why he had concluded that Mr. Jones's spine would be unstable in light of his surgical history. He explained why the surgical techniques followed by Dr. Patel did not safeguard against the spine's shifting by bracing it during the surgical procedure. And the signal was lost at the time that the procedure criticized by the expert was occurring and at the location where Dr. Patel was operating. In view of these aspects of the record, Plaintiff's Expert offered a sufficient basis for his opinion that was more than conclusory and therefore legally sufficient. *See, e.g.*, *Tex. Health Harris Methodist Hosp. Sw. Fort Worth v. Davis*, No. 02-23-00055-CV, 2024 WL 3611269, at *12–13 (Tex. App.—Fort Worth Aug. 1, 2024, pet. filed) (mem. op.); *Guerra v. Corpus Christi Med. Ctr.*, No. 13-06-00444-CV, 2008 WL 4938231, at *10 (Tex. App.—Corpus Christi–Edinburg Nov. 20, 2008, pet. denied) (mem. op.); *Morrell v. Finke*, 184 S.W.3d 257, 280–83 (Tex. App.—Fort Worth 2005, pet. denied); *Marvelli v. Alston*, 100 S.W.3d 460, 481–82 (Tex. App.—Fort Worth 2003, pet. denied); *Brownsville Pediatric Ass'n v. Reyes*, 68 S.W.3d 184, 189–91 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.); *Bronwell v. Williams*, 597 S.W.2d 542, 546–47 (Tex. App.—Amarillo 1980, writ ref'd n.r.e.). We therefore overrule Dr. Patel's first issue.

**F.     We conduct a factual-sufficiency analysis.**

When dealing with the factual sufficiency of the evidence, obviously the scope of our review is broader than our legal-sufficiency review, and we examine all the pertinent record evidence to determine that the credible evidence supporting the finding is so weak or so contrary to the overwhelming weight of all the evidence that the finding should be set aside and a new trial ordered. *Pool*, 715 S.W.2d at 635. Both parties argue that we should consider the evidence regarding there being a series of causative events, with Mr. Jones arguing that the evidence of multiple causative events is factually sufficient and Dr. Patel arguing the opposite. But, for our factual-sufficiency review, whether the evidence of other alleged causative events is lacking is not determinative. Instead, we must apply the factual-sufficiency standard to the evidence regarding the causative event for which the evidence is legally sufficient— that, knowing what he knew about Mr. Jones's history, Dr. Patel's performing the surgery in the way he did failed to meet the standard of care and caused Mr. Jones's injury.

> **1.     We explain why, although we conclude that the evidence is not factually sufficient to establish the alleged preoperative breaches of the standard of care, that deficiency does not change our analysis of the factual sufficiency of the evidence to support an intraoperative breach leading to injury.**

As we have noted, Mr. Jones builds part of his case on four alleged breaches of the preoperative standard of care: (1) the failure of Dr. Patel to examine the medical records from Mr. Jones's prior care; (2) the failure to obtain flexion and extension

81

X-rays; (3) the failure to meet with Mr. Jones an adequate number of times; and (4) the failure of Dr. Patel to obtain adequate informed consent. Dr. Patel points to either failures of proof or overwhelming opposite evidence to argue that the evidence supporting these alleged breaches of the preoperative standard of care renders the evidence supporting the jury's answer to the negligence question legally or factually insufficient.

But, as we have explained, the evidence is legally sufficient to support Plaintiff's Expert's theory of negligence based on one intraoperative breach: that with his knowledge of Mr. Jones's history, Dr. Patel performed the surgery in the wrong order. Thus, although we have examined the entire record regarding the evidence supporting the alleged preoperative breaches—and agree that the state of the evidence was not cut and dried with respect to those alleged breaches[29]—we nevertheless conclude that we need not decide that part of Dr. Patel's appellate complaints. In other words, whether the evidence was sufficient to support a conclusion that Dr. Patel should have further investigated Mr. Jones's condition before performing the surgery or

---

[29]For example, Plaintiff's Expert's opinion that Dr. Patel should have reviewed Mr. Jones's medical records from his prior surgeries to gain an understanding of what challenges operating on Mr. Jones would present remained a pure hypothetical as to causation in the face of Plaintiff's Expert's concession that he had not reviewed the records and did not know what they contained in addition to what Dr. Patel already knew. And the fact that flexion/extension X-rays were taken and the report thereof showed no instability in Mr. Jones's spine while the existing hardware was in place is telling as to that particular alleged breach but has no bearing on Plaintiff's Expert's opinion that by taking out the existing hardware without having first stabilized the L3-L4 area, Dr. Patel breached the standard of care for how to perform the surgery and that Mr. Jones was injured as a result.

whether he obtained informed consent to perform the surgery in the specific order that he did does not bear upon Plaintiff's Expert's legally sufficient single intraoperative breach—that he should have known about the order in which to do the surgery because of what he knew about Mr. Jones's history. Thus, whether there is sufficient evidence to support other breaches does not inform our examination of whether the evidence was legally sufficient regarding this particular breach.

> **2. We explain why we conclude that the evidence is factually sufficient to establish one of the intraoperative breaches of the standard of care.**

As we have noted, Mr. Jones builds his case on these breaches of the intraoperative standard of care: (1) performing the surgery in the wrong order based on Mr. Jones's surgical and spinal history of which Dr. Patel was aware, causing a compression injury; (2) continuing to operate after the loss of the neuromonitoring signal, and (3) failing to perform a wake-up test. We will address only the former.

We have explained in detail the presentation of Plaintiff's Expert's theory based on Dr. Patel's failing to brace Mr. Jones's spine at L3-L4 after removing the existing hardware and before performing the laminectomy. Plaintiff's Expert used an analogy of removing the troughs of a bridge that weakened the structure so that it eventually fell. Plaintiff's Expert concluded that because of this failure, Mr. Jones's unsupported spine shifted, and the shift caused a compression through the process of an anterolisthesis. Mr. Jones's brief touches on this theory that is pivotal to his case only to the extent of briefly quoting his expert's bridge theory and concluding that "[t]his

83

instability led to the compression of [Mr.] Jones's spinal nerves that caused his current injuries."

No physician other than Plaintiff's Expert saw indications of an anterolisthesis. And both Dr. Patel and Defendant's Expert relied on intraoperative radiological evidence that no anterolisthesis had occurred. Although Plaintiff's Expert conceded that the radiological evidence relied on by Dr. Patel and his expert did not reveal an anterolisthesis, he also opined that whether such an injury would be shown depended on when the X-rays were taken and that the resulting nerve injury would not show up on an X-ray.

Nevertheless, Plaintiff's Expert discounted any other possible ways a compression injury causing a total loss of the nerve signal could have occurred at the time it did. Dr. Patel's theory was that the compression injury was preexisting, but Plaintiff's Expert testified that such a theory did not account for the total loss of the neuromonitoring signal at the exact moment Dr. Patel was performing the laminectomy. Although the evidence regarding the other alleged breaches of the standard of care may be, as Dr. Patel argues, factually insufficient, that does not change that on the point of whether Dr. Patel's failure to adequately stabilize Mr. Jones's L3-L4 junction before continuing the surgery, the evidence amounts to a "battle of the experts" and, therefore, a question left solely to the jury to decide. *See, e.g.*, *Morrell*, 184 S.W.3d at 282.

### 3. We summarize our holding on Dr. Patel's factual-sufficiency challenges.

After reviewing the entire record and evaluating the alleged failures that Mr. Jones contends constitute breaches of the preoperative, intraoperative, and postoperative standards of care, we hold that although the evidence is factually insufficient regarding the preoperative breaches alleged by Mr. Jones (and may be factually insufficient regarding some of the other alleged breaches), Plaintiff's Expert's testimony regarding the intraoperative breach of failing to stabilize the L3-L4 joint before completing the laminectomy is factually sufficient. *See, e.g.*, *id.* Accordingly, we overrule Dr. Patel's second issue.

## IV. Vicarious Liability Analysis

In one issue, Bianco argues that the trial court erred by relying on respondeat superior to hold it jointly and severally liable for the Joneses' damages resulting from Dr. Patel's negligence. Bianco argues that the Joneses waived this ground of recovery because they failed to submit it to the jury. Bianco's argument is that the claim of respondeat superior is an independent ground of recovery that is not referable to the issue of Dr. Patel's negligence that was submitted. Bianco also challenges the trial court's conclusion that Dr. Patel's employment status and Bianco's liability for respondeat superior were conclusively proven and were thus no longer factual questions for the jury to resolve. We agree with Bianco on both arguments and hold that the Joneses' claim that Bianco is jointly and severally liable for the damages

caused by Dr. Patel's negligence was waived, and we render judgment that the Joneses take nothing from Bianco.[30]

**A.**    **We set forth the factual and procedural background of the appeal involving Bianco.**

The Joneses pleaded that Bianco was liable for the acts of Dr. Patel because

[a]t all pertinent times [Dr.] Patel was an agent, employee, servant, representative, member, officer[,] and/or director of BIANCO BRAIN AND SPINE[] and was acting within the course and scope of his employment at all pertinent times.  As such, BIANCO BRAIN AND SPINE[] is vicariously responsible for the negligence of [Dr.] Patel under the doctrine of *respondeat superior*.

The testimony on the question of Dr. Patel's status vis-à-vis Bianco consumed a relatively small portion of the trial record, and the parties agree that the following constitutes the testimony that should be considered:

Q.  Okay.  Sir, on [October 30, 2017, the date of the surgery], were you employed?

A.  Yes.

Q.  And who were you employed by?

A.  By my partner, Bianco Brain and Spine.

Q.  Okay.  Was he your partner at that time?

A.  I was his employee.

Q.  Okay.  Is he your partner today?

A.  I'm still an employee.

---

[30]Bianco also raises an issue that simply adopts Dr. Patel's "issues, arguments[,] and authorities."  We will discuss those matters no further.  *See* Tex. R. App. P. 47.1.

Q. Okay. So you're a non-equity partner if you're a partner?

A. Correct.

. . . .

Q. Okay. Were you in the course and scope of your employment with Bianco Brain and Spine at the time you operated on [Mr.] Jones'[s] back?

A. Yes.

Q. You did it as an employee, and you were making money for the company, true?

A. Not making money for the company. I was providing money for myself.

Q. Is it your testimony, sir, that Bianco doesn't receive any of the proceeds from your work?

A. That's correct.

Q. So then what's the point of being an employee?

A. We share overhead.

Q. Well, that sounds like a partnership.

A. It's not really a partnership because he owns the company a hundred percent.

Q. So he owns the company, and he makes no money off of you?

A. No.

Q. So how does it benefit his company?

A. He has someone that can help him out with duties around the office and at the hospital.

Q. Okay. So you make a hundred percent of all the proceeds for every surgery?

A. Correct.

Q. And they go straight to your pocket?

A. Yes.

Q. Who writes your checks?

A. Bianco Brain and Spine.

Q. Well, how does the money end up in Bianco Brain and Spine's account, where they write you the check, if the money all goes straight to you?

A. Our billing department just collects the money.

Q. Was Dr. Bianco present on October 30[], 2017?

A. No, he was not.

Q. Was he involved in any way with the surgery of [Mr.] Jones?

A. No.

Q. Did he see you operate on [Mr.] Jones?

A. He did not.

Q. Did he give you any training as to how to be a neurosurgeon?

A. Not that I had not already received.

Q. But you received all your training through other places, right?

A. Correct.

Q.  But, nevertheless, he is your -- he was your employer at the time of October 30, 2017?

A.  Yes.

Later in the trial, the following exchange occurred:

Q.  And you've been an employee of Bianco Brain and Spine since 2014?

A.  I have.

Q.  Now, earlier you were asked -- and I don't think it was intentional, but you were asked if you were Dr. Bianco's employee, and you had agreed with that.  You understand that's not --

A.  Bianco Brain and Spine employee.

Q.  All right.  Very good.  What type of surgeries have you done since joining Bianco Brain and Spine as an employee?

A.  The full spectrum of neurosurgery from brain tumors, traumatic skull fractures, hemorrhages, traumatic fractures of the spine, and elective surgery, including cervical, thoracic, lumbar fusions, and tumors within and around the spinal cord.

The jury charge submitted only a single liability question asking whether Dr. Patel's negligence proximately caused the injury in question.  When a proposed judgment was submitted decreeing that Bianco was vicariously liable for Dr. Patel's negligence on the basis of respondeat superior, Bianco objected to the proposed judgment because the Joneses "[had] not submit[ted] any jury questions necessary for them to recover under respondeat superior."

In response to Bianco's objection, the Joneses claimed that Dr. Patel's employment status was conclusively proven and tried to put before the court

89

additional evidence on the question that had not been presented at trial. Bianco responded in turn and moved to strike the evidence attached to the Joneses' response. Bianco's response produced a surreply from the Joneses that included a request to reopen the evidence. The parties then filed additional papers on the issue.

After this activity, the trial court signed an "Order Regarding [the Joneses'] Motion for Entry of Judgment" that recited the following:

> After considering the [Joneses'] motion, [Bianco's] objections, additional briefing, legal authority, evidence admitted at trial, and the jury verdict, the [c]ourt finds that [Bianco's] objections to the legal and factual sufficiency of the jury verdict should be overruled. The [c]ourt further finds that *the evidence presented at trial conclusively* established that [Dr.] Patel was acting in the course and scope of his employment with Bianco PLLC at all times relevant to this lawsuit and [that] no reasonable juror could have found otherwise. The [c]ourt, accordingly, determines that Bianco PLLC is vicariously liable for [Dr.] Patel's negligence and jointly and severally liable for the damages awarded in the jury verdict. [Emphasis added.]

The trial court's conclusion that the evidence was conclusive on Bianco's liability was carried forward into its judgment, which stated,

> This court finds that it was *conclusively* established that Dr. Nikhil Kanti Patel was an employee of Defendant Bianco Brain and Spine, PLLC and was acting in the course and scope of his employment with Bianco Brain and Spine, PLLC at all times relevant to this lawsuit. The [c]ourt, therefore, finds that Bianco Brain and Spine, PLLC is vicariously liable for the acts of Dr. Nikhil Kanti Patel on the basis of respondeat superior. [Emphasis added.]

Bianco challenged this finding in its motion for new trial and motion for judgment notwithstanding the verdict. Both motions were denied by written order.

90

**B.** **We analyze whether the elements of respondeat superior are referable to the jury's finding that Dr. Patel's acts were negligent and a proximate cause of injury and, if not, whether the record conclusively establishes that Bianco is vicariously liable for Dr. Patel's negligence under the doctrine of respondeat superior.**

The briefing is somewhat difficult to follow because it shifts between concepts. As an example, though the trial court concluded that the evidence was conclusive that Dr. Patel was an employee and was acting within the course and scope of his employment, the Joneses argue that the trial court's conclusion actually evidences an implied finding that could be supported by factually sufficient evidence.

We will impose our own structure on the argument. The issue before us turns primarily on two questions: (1) are the issues relating to Bianco's vicarious liability on the basis of respondeat superior referable to the negligence issue submitted with respect to Dr. Patel—a state of affairs that would permit the trial court to make its own factual finding on the element or elements omitted or for us to imply that such a finding was made; and (2) if the vicarious liability/respondeat superior ground was not referable to a claim that was submitted, does the record establish that the elements of the ground ceased to be ones for the jury because it was conclusively established that Bianco was vicariously liable on the basis of respondeat superior for Dr. Patel's negligence? We hold that the respondeat superior ground is an independent ground of recovery and is not referable to the negligence finding with respect to Dr. Patel. We also hold that the evidence is not conclusive on the elements that had to be found to hold Bianco liable under the doctrine of respondeat superior.

91

As a subsidiary issue, we also do not accept the Joneses' effort to rely on evidence that was not introduced at trial because the trial court did not rely on that evidence and because the Joneses did not preserve error on the contention that the trial court should have considered the additional evidence.

### 1. Texas Rule of Civil Procedure 279 drives our analysis.

Texas Rule of Civil Procedure 279 addresses the consequences of not submitting a ground of recovery to a jury (and by implication when an issue need not be submitted to a jury) and when a trial court is empowered to make a finding in lieu of a jury as follows:

- Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived.

- When a ground of recovery or defense consists of more than one element, if one or more of such elements necessary to sustain such ground of recovery or defense, and necessarily referable thereto, are submitted to and found by the jury, and one or more of such elements are omitted from the charge, without request or objection, and there is factually sufficient evidence to support a finding thereon, the trial court, at the request of either party, may after notice and hearing and at any time before the judgment is rendered, make and file written findings on such omitted element or elements in support of the judgment.

Tex. R. Civ. P. 279 (bullets added for ease of reading).

The rationale for Rule 279's provision that a factual issue conclusively proven need not be submitted to the jury is obvious—the question has passed from being

one of fact to one of law. *See, e.g.*, *Wales v. Ruppert*, No. 09-17-00080-CV, 2018 WL 757005, at *5 (Tex. App.—Beaumont Feb. 8, 2018, pet. denied) (mem. op.) ("The question of whether an agency relationship exists is one of fact unless the issue is undisputed or the evidence establishes the relationship as a matter of law."). We apply the following standard to determine whether the evidence is conclusive:

> In reviewing a conclusive[-]evidence point, we must determine whether the proffered evidence as a whole rises to a level that reasonable people could not differ in their conclusions. *Transp*[.] *Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex. 1994)[, *superseded by statute as recognized in U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118 (Tex. 2012)]; Powers & Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex. L. Rev. 515, 523 (1991) ("Ultimately, the test for 'conclusive evidence' . . . is similar to the test for 'no evidence' . . . ; the court asks whether reasonable minds could differ about the fact determination to be made by the jury.").

*Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 340 (Tex. 1998) (op. on reh'g).

The rationale for the second quoted provision of Rule 279 is that if a party does not challenge a charge that omits an element of a ground of recovery that is submitted to the jury, i.e., a referable issue, the party has ceded the fact-finding function to the trial court. Specifically,

> [t]he purpose of the "necessarily referable" requirement in Rule 279 is to give parties, against whom issues are to be deemed, fair notice of a partial submission, so that they have an opportunity to object to the charge or request submission of the missing issues to the ground of recovery or defense. Once a party is on notice of the independent ground of recovery or defense due to the existence of an issue "necessarily referable" thereto, if that party fails to object or request submission of the missing issues, he cannot be heard to complain on appeal, as he is said to have consented to the court's findings on the missing issues.

93

*DiGiuseppe v. Lawler*, 269 S.W.3d 588, 593–94, 599 (Tex. 2008) (quoting *Superior Trucks, Inc. v. Allen*, 664 S.W.2d 136, 144 (Tex. App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.)); *see also Diamond Offshore Drilling, Inc. v. Black*, 652 S.W.3d 463, 472 (Tex. App.—Houston [14th Dist.] 2022, no pet.) ("There was no objection to the charge on grounds that this element was omitted[,] nor were written findings made by the trial court on this point. Therefore, the omitted element is deemed to have been found by the trial court in such a manner as to support the judgment.").

When we review a finding made on an omitted-deemed-referable element, we apply sufficiency standards of review:

> When an element of a claim is omitted from the jury charge without objection and no written findings are made by the trial court on that element[,] then the omitted element is deemed to have been found by the court in such manner as to support the judgment. Tex. R. Civ. P. 279; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). Here[,] there was no objection to the charge on the basis that it omitted the element[,] nor did the trial court make findings on it, so there is a deemed finding in support of the judgment. But just as with any other finding, there must be evidence to support a deemed finding. Thus, we next address whether legally sufficient evidence supports the finding here.

*Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228–29 (Tex. 2011).

### 2. Vicarious liability based on respondeat superior is an independent ground of recovery—no element of which was submitted to the jury in this matter.

Below, the trial court concluded that the evidence had conclusively established Bianco's vicarious liability. The Joneses, however, spend much of their brief on the question of whether the evidence is factually sufficient to support an implied finding.

But the ability of the trial court to make an implied finding depends on whether the submitted question about Dr. Patel's negligence made the respondeat superior issues referable to that ground; if so, Bianco waived the right to object to the trial court's making a deemed finding in support of the judgment. We conclude that the vicarious liability/respondeat superior ground is an independent ground of recovery and not referable to the negligence issue submitted with respect to Dr. Patel. For this reason, the elements of the vicarious liability ground that were based on respondeat superior were not omitted "elements" for which the trial court could make an implied finding. The issue will become, as we discuss in the next section, whether the evidence is conclusive that Bianco is vicariously liable.

Bianco cites authority for the proposition that the question of vicarious liability is an independent ground of recovery. *See Smith v. Williams*, No. 06-14-00040-CV, 2015 WL 3526089, at *12 (Tex. App.—Texarkana May 29, 2015, no pet.) (mem. op.). *Smith* dealt directly with this question and held that

> [w]e must consider whether the judgment can be supported under a theory of *respondeat superior* in the absence of jury findings that [appellant] was Rushing's employee and that he was acting in the course and scope of his employment. "[I]f no element of an independent ground of recovery or defense is requested or submitted, that independent ground is waived unless it is conclusively established." *J & C Drilling Co. v. Salaiz*, 866 S.W.2d 632, 635 (Tex. App.—San Antonio 1993, no [writ]) (citing Tex. R. Civ. P. 279). Recovery against Rushing for his vicarious liability under a theory of *respondeat superior* would be an independent ground of recovery. *Id.* "'A trial court is not authorized to make findings of fact pursuant to Rule 279 when the omitted issue is an independent ground of recovery and no issues referable to it were submitted to the jury.'" *Id.* (quoting *Tribble & Stephens Co. v. Consol. Servs.,*

95

*Inc.*, 744 S.W.2d 945, 951 (Tex. App.—San Antonio 1987, writ denied)). In this case, no issue concerning [appellant's] employment with Rushing, or any element referable to it, was submitted. [Appellee] had the burden to request a jury question regarding vicarious liability. *See Laredo Med. Grp. v. Jaimes*, 227 S.W.3d 170, 174 (Tex. App.—San Antonio 2007, pet. denied). Having failed to do so, to hold Rushing vicariously liable for [appellant's] actions, [appellee] became encumbered with a heavy burden. Since his employment was in issue, [appellee] had to show first that [appellant] was in the service of Rushing with the understanding that Rushing had "the right to direct the details of his work and not merely the result to be accomplished" at the time of the accident. Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence, Intentional Personal Torts & Workers' Compensation* PJC 10.1 (2014); *see Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002); *Salaiz*, 866 S.W.2d at 636. In addition, [appellee] had to conclusively show that [appellant] was acting within the course and scope of his employment. *Robertson Tank Lines, Inc. v. Van Cleave*, 468 S.W.2d 354, 357 (Tex. 1971); *see Salaiz*, 866 S.W.2d at 636. Unless the evidence conclusively establishes that [appellant] was Rushing's employee and that he was acting in the course and scope of his employment at the time of the accident, this theory of recovery was waived. *Salaiz*, 866 S.W.2d at 636; [*see*] Tex. R. Civ. P. 279.

*Id.* (footnotes omitted); *see also Laredo Med. Grp.*, 227 S.W.3d at 174 (concluding that a finding that the doctor was negligent could not support a deemed finding of vicarious liability because "[g]iven that no question was submitted that was necessarily referable to the theory of vicarious liability, no deemed finding could be made based on the jury's verdict"); *Salaiz*, 866 S.W.2d at 636 ("Because appellees failed to submit any element necessarily referable to respondeat superior, the court could not make a deemed finding of course and scope of employment.").[31]

---

[31]Pattern Jury Charge 10.1 provides the following freestanding question for employment status:

Bianco supports the logic of the cited authority by noting that "employment status and course and scope are the very essence—the *entirety*—of a vicarious liability claim, not merely elements of a separate overarching claim." *See Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 131 (Tex. 2018) (citing *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007), and stating that "to prove an employer's vicarious liability for a worker's negligence, the plaintiff must show that, at the time of the negligent conduct, the worker (1) was an employee and (2) was acting in the course and scope of his employment"). Thus, the issues omitted from the charge were not embedded within the question of Dr. Patel's negligence.

The cases that the Joneses rely on to counter the proposition that vicarious liability based on respondeat superior is an independent, nonreferable ground of recovery are inapposite. The Joneses place great reliance on *Ramos v. Frito-Lay, Inc.*,

---

Question ___

     On the occasion in question, was *Don Davis* acting as an employee of *ABC Company*?

     An "employee" is a person in the service of another with the understanding, express or implied, that such person has the right to direct the details of the work and not merely the result to be accomplished.

Answer "Yes" or "No."

Answer: _____

Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence, Intentional Personal Torts & Workers' Compensation* PJC 10.1 (2022).

784 S.W.2d 667 (Tex. 1990). But as Bianco points out, *Ramos* involved a submitted

exemplary-damage question that asked if an employee had acted in the scope of his

employment but failed to include the element of whether he had acted in a managerial

capacity. *Id.* at 668. The Texas Supreme Court held that the question of managerial

capacity was, in essence, an element of the claim submitted:

> Here, the jury found that [the employee] committed an intentional tort
> while in the scope of his employment and awarded exemplary damages
> against Frito-Lay. The trial court's judgment included an award for
> exemplary damages. Although the question of whether [the employee]
> was employed in a managerial capacity and acting in the scope of his
> employment constituted an element of [appellant's] cause of action, it
> did not encompass an independent ground of recovery. *See Treasure City
> v. Strange*, 620 S.W.2d 811, 813 (Tex. . . . App.—Dallas 1981, no writ).
> Objection by Frito-Lay to the omission of the element of managerial
> capacity was thus necessary to prevent a deemed finding against it. *See
> Accent Builders Co. v. S[w.] Concrete Sys[.], Inc.*, 679 S.W.2d 106, 110–11 (Tex.
> App.—Dallas 1984, writ ref'd n.r.e.). Frito-Lay did not object, nor did it
> request specific findings by the trial court. If the omitted element of
> managerial capacity is supported by some evidence, we must deem it
> found against Frito-Lay under Rule 279. *See Payne v. Snyder*, 661 S.W.2d
> 134, 142 (Tex. App.—Amarillo 1983, writ ref'd n.r.e.)[ (op. on reh'g).]

*Id.* We agree with Bianco that *Ramos* is distinguishable because it involved a different

theory and did not address the question of whether vicarious liability and respondeat

superior constitute an independent ground of recovery.

The Joneses next primarily rely on three additional cases to support their

argument that vicarious liability is not an independent ground of recovery. But the

cited cases involve the submission of a negligence claim against a corporate parent

and failed to ask whether a person was an employee of that parent. *See Serv. Corp. Int'l*,

348 S.W.3d at 227–29; *Black*, 652 S.W.3d at 471–72; *Ross Stores, Inc. v. Miller*, 612 S.W.3d 682, 685–91 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

The holdings of the cited cases were thoroughly analyzed in *Black*. *Black* involved an argument "that no jury findings were requested or made with respect to alter ego, agency, respondeat superior, or any other legal theory that could establish a cognizable duty on the part of the [parent corporation] separate from [its employment subsidiary], with whom [the plaintiff] had signed an employment agreement." 652 S.W.3d at 471. *Black* then delved into why the question of employment was not an independent ground of recovery but an element of the claim that was submitted:

> This argument is similar to those analyzed and rejected in *Service Corporation International . . .* and *Ross Stores, Inc. . . . .* In *Service Corporation International*, the plaintiffs sued a cemetery operator and its parent corporation after their relative's body was moved to another burial plot without their consent. 348 S.W.3d at 227. The jury returned a verdict in favor of the plaintiffs. *Id.* On appeal, the defendants challenged the predicate findings necessary to support the plaintiffs' negligence claim and argued the jury charge failed to "contain a separate question asking if any of the actors were [the parent corporation's] employees." *Id.* at 228. Rejecting this argument, the court stated that "[w]hether the actors involved in this case were [the parent corporation's] employees was not an independent ground of recovery; the actors' status as employees was an *element* of the [plaintiffs'] negligence claim against [the parent corporation]." *Id.* (emphasis in original). The court further held[, as we set forth above, that]
>
>> [w]hen an element of the claim is omitted from the jury charge without objection and no written findings are made by the trial court on that element[,] then the omitted element is deemed to have been found by the court in such manner as to support the judgment. Here[,] there was no

99

objection to the charge on the basis that it omitted the element[,] nor did the trial court make a finding on it, so there is a deemed finding in support of the judgment.

*Id.* at 228–29 (internal citations omitted).

In *Ross Stores, Inc.*, the plaintiff sued the parent corporation of Ross Dress for Less, Inc. after he sustained injuries in a physical altercation at work. 612 S.W.3d at 685. The jury returned a verdict for the plaintiff on his negligence claims. *Id.* On appeal, the parent corporation argued that the evidence was legally insufficient to support the jury's negligence finding since the plaintiff was not an employee of the parent corporation[,] nor did the parent corporation assume control over its subsidiary's safety policies. *Id.* at 687–88. In response, the plaintiff argued that the parent corporation [had] waived this issue by failing to request "a threshold fact question 'calculated to determine the question of duty.'" *Id.* at 688. But as in *Service Corporation International*, the parent corporation's argument focused on an element of the plaintiff's negligence claim. *Id.* "[T]here was no objection to the charge on the basis that it omitted the element, and the trial court did not make a finding on this element, so there [was] a deemed finding in support of the judgment." *Id.* The court proceeded to analyze whether this deemed finding was supported by legally sufficient evidence. *See id.* at 687–91.

Here too, the question of whether either [a]ppellant had a relationship with the actors in this case sufficient to support the imposition of a duty was an element of [appellee's] claims against [a]ppellants. *See Serv. Corp. Int'l*, 348 S.W.3d at 228–29; *Ross Stores, Inc.*, 612 S.W.3d at 686. There was no objection to the charge on grounds that this element was omitted[,] nor were written findings made by the trial court on this point. Therefore, the omitted element is deemed to have been found by the trial court in such a manner as to support the judgment. *Serv. Corp. Int'l*, 348 S.W.3d at 229; *Ross Stores, Inc.*, 612 S.W.3d at 686. But as with other findings, there must be evidence in the record to support a deemed finding. *Serv. Corp. Int'l*, 348 S.W.3d at 229; *Ross Stores, Inc.*, 612 S.W.3d at 686.

*Id.* at 471–72.

Bianco distinguishes the cited cases because they involved an unsubmitted issue that was a part of the claim submitted against the defendant parent, thus requiring "the juries . . . to implicitly conclude that the actors involved were the defendants' employees." As Bianco notes,

> [The Joneses] brought no direct negligence claim against Bianco, only against Dr. Patel. In assessing the direct negligence of Dr. Patel—the only theory of liability submitted—the jury did not need to implicitly find that Dr. Patel was Bianco's employee. Dr. Patel's employment status was not an element of the direct negligence claim alleged by [the Joneses] and submitted to the jury. Instead, whether Dr. Patel was Bianco's employee and [was] acting in the course and scope of employment were the unique elements of [the Joneses'] separate claim against Bianco based on respondeat superior. [Record references omitted.]

We agree that *Service Corporation International*, *Black*, and *Ross* are inapposite.

Thus, we conclude that the elements of the ground of respondeat superior are not subsumed into the question of Dr. Patel's liability for negligence. Though Bianco failed to object to the omission, no deemed finding on the ground resulted from that failure because respondeat superior is an independent ground of recovery.

> **3. The record is not conclusive on the question of whether Bianco is vicariously liable for the negligence of Dr. Patel based on the ground of respondeat superior.**

Without the availability of a deemed finding, the question becomes whether the trial court was correct in concluding that the respondeat superior liability ground was transformed from one of fact to one of law because the record is conclusive on the elements of that ground. Only if the record is conclusive have the Joneses avoided a

101

waiver of the ground of respondeat superior because they bore the burden of proof on the question and because no element of the ground of recovery was submitted. We conclude that the proof is not conclusive.

There is no question that the Joneses bore the burden on the question of whether Bianco was liable under the doctrine of respondeat superior. *See 20801, Inc. v. Parker*, 249 S.W.3d 392, 397 n.6 (Tex. 2008) ("Generally, to succeed on a respondeat superior theory, plaintiffs bear the burden of establishing that an employee acted within the course and scope of his or her employment.").

As we have already mentioned, and as the parties agree, "[i]n reviewing a conclusive[-]evidence point, we must determine whether the proffered evidence as a whole rises to a level that reasonable people could not differ in their conclusions." *Uniroyal Goodrich Tire Co.*, 977 S.W.2d at 340. And as the Joneses themselves note, "'[U]ncontroverted issues need not be submitted to the jury at all' because jurors are not free to 'ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistenc[i]es, and [that] could have been readily controverted.'" And simply because evidence is undisputed does not make it conclusive: "Undisputed evidence and conclusive evidence are not the same— undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed." *City of Keller*, 168 S.W.3d at 816.

## 4. We set forth the standard that we follow in determining the employment status that controls the question of respondeat superior.

To a certain extent, the parties dance around the question of what standard we should apply to determine whether Dr. Patel is Bianco's employee. To answer this question, we look to analogous precedent from this court that outlined the standard to determine whether a physician was a hospital employee versus an independent contractor. *See Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 911 (Tex. App.—Fort Worth 2009, pet. denied).

As a starting point, *Farlow* noted that

> [u]nder the doctrine of respondeat superior, an employer may be vicariously liable for the negligence of its agent or employee who was acting within the scope of employment even though the employer did not personally commit a wrong. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 541–42 (Tex. 2002); *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998); *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 713 (Tex. App.—Fort Worth 2006, no pet.). But a person or entity that hires an independent contractor is generally not vicariously liable for the tort or negligence of that person. *Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 947; *Enserch Corp. v. Parker*, 794 S.W.2d 2, 6 (Tex. 1990); *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985). For example, a hospital is ordinarily not liable for the negligence of a physician who is an independent contractor. *Baptist Mem'l Hosp. Sys.*, 969 S.W.2d at 948; *Espalin v. Children's Med. Ctr. of Dall*[.], 27 S.W.3d 675, 684 (Tex. App.—Dallas 2000, no pet.).

*Id.* at 910–11.

*Farlow* then delved into the complex and multifaceted question of employment status and explained in detail that the "right to control" is the pivotal issue:

> The right of control is the "supreme test" for determining whether a master–servant relationship exists. *Golden Spread Council, Inc. No. 562 of*

103

*Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 290 (Tex. 1996); *Omega Contracting, Inc. v. Torres*, 191 S.W.3d 828, 847 (Tex. App.—Fort Worth 2006, no pet.)[ (en banc op. on reh'g)]. In determining whether a worker is an employee or [an] independent contractor, the focus is on who has the right to control the details of the work. *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex. 1993); *EPGT Tex. Pipeline, L.P. v. Harris [Cnty.] Flood Control Dist.*, 176 S.W.3d 330, 336 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd). An independent contractor is one who, in pursuit of an independent business, undertakes specific work for another using his or her own means and methods without submitting to the control of the other person as to the details of the work. *Indus. Indem. Exch. v. Southard*, . . . 160 S.W.2d 905, 907 ([Tex. ]1942); *Schievink v. Wendylou Ranch, Inc.*, 227 S.W.3d 862, 866 (Tex. App.—Eastland 2007, pet. denied).

A contract expressly providing that a person is an independent contractor is determinative of the relationship absent evidence that the contract is a mere sham or subterfuge designed to conceal the true legal status of the parties or that the contract has been modified by a subsequent agreement between the parties. *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 588–90, 592 (Tex. 1964); *Bell*, 205 S.W.3d at 713–14; *Weidner v. Sanchez*, 14 S.W.3d 353, 373 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Evidence that the parties did not intend for an independent contractor relationship can come from the contract itself, i.e., whether, despite language describing the relationship as an independent[-]contractor relationship, other contract language evidences such a right of control that the relationship is actually that of employer/employee. *Newspapers, Inc.*, 380 S.W.2d at 591–92; *Bell*, 205 S.W.3d at 713–14. It can also come from extrinsic evidence, such as instances of actual control by the principal sufficient to show that the true agreement of the parties vested a right of control establishing an employment relationship. *Newspapers, Inc.*, 380 S.W.2d at 590–92 ("[T]he 'right to control' remains the supreme test[,] and the 'exercise of control' necessarily presupposes a right to control which must be related to some agreement expressed or implied."); *Bell*, 205 S.W.3d at 713–14. In such cases, the exercise of control is evidentiary only and "must be so persistent and the acquiescence therein so pronounced as to raise an inference that at the time of the act or omission giving rise to liability, the parties by implied consent and acquiescence had agreed that the principal might have the right to control the details of the work." *Newspapers, Inc.*, 380 S.W.2d at 592.

We may consider several factors in determining the extent of the right of control: (1) the independent nature of the person's business; (2) the person's obligation to furnish necessary tools, supplies, and material to perform the job; (3) the right to control progress of the work, except as to final results; (4) the time for which the person is employed; and (5) the method of payment, whether by time or by the job. *Tex. A & M Univ. v. Bishop*, 156 S.W.3d 580, 584–85 (Tex. 2005); *Limestone Prods. . . . ,* 71 S.W.3d [at] 312 . . . . To trigger vicarious liability, the right to control must extend to the specific activity from which the injury arose. *Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 736 (Tex. 1998); *Exxon Corp.*, 867 S.W.2d at 23; *Omega Contracting*, 191 S.W.3d at 847.

*Id.* at 911–12 (footnote omitted).[32] *Farlow* also noted that the right-to-control question is ordinarily one of fact, unless the facts are undisputed. *Id.* at 912.

### 5. The evidence is not conclusive that Dr. Patel was an employee of Bianco.

We have quoted the brief portion of the record that deals with what status Dr. Patel held vis-à-vis Bianco. That testimony is not conclusive of the question of respondeat superior.

Certainly Dr. Patel described himself as an employee. But we have no idea what Dr. Patel's subjective definition was of the term "employee." We can place little weight on a layman's characterization of himself as an employee as being conclusive

---

[32]The Joneses cite the following statement from the dissent in *St. Joseph Hospital* for the control standard that we should apply:

In *St. Joseph*, the Texas Supreme Court held that a physician was acting in the course and scope of his employment when his treatment of the plaintiff was "(1) within the scope of his general authority; (2) in furtherance of [the hospital's] business; . . . and (3) for the accomplishment of the object for which [the doctor] was hired." [94 S.W.3d at 549 (Enoch, J., dissenting).]

when the witness opined without any knowledge of what the law views an employee to be or the legal standards that control the question.[33]

Beyond this, Dr. Patel was not consistent in his characterization of himself as an employee. For example, when asked who employed him, he stated, "[M]y *partner*, Bianco Brain and Spine." [Emphasis added.] Then he responded affirmatively when asked if he was a non-equity partner. Finally, he responded in a way that left open the question of exactly what the relationship was when he was asked about the partnership: "*It's not really a partnership* because [Dr. Bianco] owns the company a hundred percent." [Emphasis added.] Thus, Dr. Patel was opining that he was an employee rather than a partner because of his view of what constitutes a partnership; again, he was making what is tantamount to a legal conclusion based on some unexplained, subjective standard.

Even the Joneses admit that evidence is only conclusive when it is clear, positive, direct, and free from inconsistencies or contradiction. The statement by a lay witness—that he is an employee without any information on the witness's concept of what an employee is and in view of a witness's other statements showing confusion—

---

[33]As a general proposition, a witness cannot offer an opinion on a pure question of law. *Mega Child Care, Inc. v. Tex. Dep't of Protective & Regul. Servs.*, 29 S.W.3d 303, 309 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Under limited circumstances, an expert may do so, but only if the expert is offering an opinion on a mixed question of law and fact after a standard or measure is fixed by law and the expert is asked whether the person or conduct measures up to that standard. *Id.*

is not clear, positive, and direct and is hardly free from contradiction and inconsistency.

And even if Dr. Patel was not a partner, the possibility is open that he may have been an independent contractor under the standard of *Farlow*. As noted from the testimony we quoted, Dr. Patel testified that he was in the course and scope of his employment when he operated on Mr. Jones:

> Q. Okay. Were you in the course and scope of your employment with Bianco Brain and Spine at the time you operated on [Mr.] Jones'[s] back?
>
> A. Yes.

Again, what these words mean to legal laymen such as Dr. Patel and the legal implication that the Joneses draw from them as an admission on the legal issues of respondeat superior may well be two different things.

Beyond this, whatever can be gleaned from this statement by Dr. Patel, his later testimony is not consistent with it. As Bianco points out in its reply brief,

> With regard to the trial evidence, [the Joneses] lean on two points in Dr. Patel's testimony when he responded during direct[-] and cross-examination that he was Bianco's employee and [that he] was in the course and scope of that employment at the time of the incident. [The Joneses] then explain away the remaining evidence at trial relevant to Dr. Patel's employment status.
>
> But the evidence negating Dr. Patel's employment with Bianco—contained within Dr. Patel's own conflicting and internally inconsistent testimony—created the exact definition of a disputed issue of fact.
>
> • Dr. Patel receives 100% of the proceeds from every surgery he performs—it goes "straight in [his] pocket." He

107

was "[n]ot making money for the company." He was "providing money for [himself]."

- Dr. Bianco did not direct the details of Dr. Patel's surgery, and Dr. Patel received no training from [Dr.] Bianco that he had not already received.

- Dr. Patel shared overhead costs with Dr. Bianco.

- Dr. Patel's duties for [Dr.] Bianco were limited. He was merely available to "help [Dr. Bianco] out with duties around the office and at the hospital."

Dr. Patel's testimony that he was Bianco's employee was not consistent with the foregoing testimony of factors calling into question Bianco's right to direct the details of Dr. Patel's work and whether Dr. Patel was working in the furtherance of Bianco's business or his own. . . . Because this evidence would have allowed "reasonable and fair-minded people to differ in their conclusions," the issue should have been submitted to the jury. *See City of Keller*, 168 S.W.3d at 822. [Record references omitted.]

Again, we agree that the sparse and inconsistent testimony of Dr. Patel is not conclusive.

As we have noted, the right to control is a central (and usually a factual) question in determining whether one is an employee. *Farlow*, 284 S.W.3d at 911–12. What constitutes the necessary degree of control was recently examined in detail by the Corpus Christi–Edinburg Court of Appeals. We will not portray the lengths to which the court went in its analysis but instead quote only a part of its conclusion that conveys the complexity of the question:

Application of the factors identified by the Texas Supreme Court leads us to the same conclusion. [Appellant] furnished [the doctor who performed the surgery on appellee's daughter] with all necessary tools,

108

supplies, and materials to perform the job; it required [the doctor] to provide medical services for at least forty hours a week; it had discretion to change the sites at which he practiced; and it paid [the doctor] a regular salary for his services. *See Limestone Prods.*, 71 S.W.3d at 312. Moreover, the "Physician Employment Agreement" required [the doctor] to "complete patient medical records and discharge summaries within ninety-six (96) hours"; to comply with "all reasonable rules, regulations, procedures, policies[,] and bylaws of" [appellant]; and to "practice using standard coding practices." The fact that [the doctor] retained the right to exercise his "independent medical judgment" in treating patients does not "vitiate [appellant]'s right to control the details of his practice." *Murk*[ *v. Scheele*], 120 S.W.3d [865,] 867 [(Tex. 2003)]. That argument "sweeps far too broadly" and "proves too much." *Id.*; *Dalehite*[ *v. Nauta*], 79 S.W.3d [243,] 245–46 [(Tex. App.—Houston [14th Dist.] 2002, pet. denied)].

In any event, the agreement in this case also purported to restrict the manner in which [the doctor] rendered medical services. In particular, it required him to perform medical services: (1) "within the currently approved methods and standards of practice for the Medical Services in the medical community"; (2) "in a manner in which such services are normally provided by a physician in [his s]pecialt[y] and in accordance with [appellant]'s protocols, policies[,] and procedures"; (3) "faithfully, diligently[,] and in a professional and efficient manner"; and (4) "in accordance with treatment protocols of the American Society of Pediatric Neurosurgeons, the American Board of Pediatric Neurological Surgery, and all applicable rules of the Federal Drug Administration." The presence of these restrictions indicates that, although [the doctor] ostensibly retained the right to exercise his independent medical judgment in treating patients, that right was not absolute. *See J.M. Davidson, Inc.*[ *v. Webster*], 128 S.W.3d [223,] 229 [(Tex. 2003)] (noting that we must consider the entire writing in an effort to harmonize and give effect to all of its provisions).

*Renaissance Med. Found. v. Lugo*, 672 S.W.3d 901, 911 (Tex. App.—Corpus Christi–

Edinburg 2023, pet. granted) (op. on reh'g).

The quote reveals the complexity that the right-to-control question presents.

We agree that the simple fact that Dr. Patel exercised his own judgment in performing

109

surgery did not preclude him from being an employee, but as *Renaissance* notes, a whole range of other factors—such as salary, work regulations, and practice standards—are reviewed to determine the pivotal right-to-control question. Here, we have testimony where it is unclear whether Dr. Patel even knows what position he holds based on his subjective view of what an employee is. Further, he receives all the proceeds from the surgeries that he performs, and Bianco makes no money off him—a fact that appears contradictory to employee status. He benefits Bianco through some unspecified process of sharing overhead—a fact so vague that it provides no guidance on the question of whether Bianco exercised sufficient control over Dr. Patel for him to be its employee (e.g., is the sharing according to a formula or Dr. Patel's whim?).[34] And then his job duties include providing Bianco's owner with

---

[34]The Joneses cite a raft of cases for the proposition that contributing to overhead does not prevent a doctor from being an employee:

> Courts across the country agree. *See*[,] *e.g.*[,] *Mich*[.] *Neurology Assoc*[s.], *PC v. Beall*, No. 347341, 2020 WL 1649785, at *1 (Mich. Ct. App. Apr. 2, 2020) [(per curiam) (not designated for publication)] (parties stipulated that doctor was an employee even though his income required him to pay a portion of the employer's "actual overhead relative to actual income"); *Jones v. Auge*, 344 P.3d 989, 993, 1002, 1003 (N.M. [Ct.] App. 2014) (doctor was "an employee of the corporation . . . of orthopaedic surgeons . . . and . . . responsible for his share of overhead costs"); *Klonoski v. Cardiovascular Consultants of Cape Girardeau, Inc.*, 171 S.W.3d 70, 71, 75 (Mo. Ct. App. 2005) (doctor shifted from "salaried employee" to "production-based employee" when his salary began to be calculated solely on the basis of his own patient bookings, after deducting overhead); *Efird v. Clinic of Plastic & Reconstructive Surgery, P.A.*, 147 S.W.3d 208, 212 (Tenn. Ct. App. 2003) (physician was "employee of medical clinic" and his compensation was based on "fees generated by

110

"someone [who] can help him out with duties around the office and at the hospital." From this snippet, we have no idea whether Dr. Patel does these things when the whim strikes him or if the duties are regimented by an agreement with Bianco. The Joneses' argument fails that Dr. Patel's brief, vague, and contradictory testimony carries the day to establish conclusively—to the point that reasonable people could not differ—that Bianco exercised the level of control over Dr. Patel that Bianco became liable for Dr. Patel's negligence based on respondeat superior.

6. **The cases that the Joneses cite—for the proposition that we must consider Dr. Patel's testimony as conclusive because it was undisputed—are not persuasive.**

The Joneses primarily cite several cases to support a proposition that we should hold that Dr. Patel's testimony was conclusive because it was not controverted. That proposition begs the question whether it was conclusive in and of itself; testimony

---

him during his employment" minus a "weighted share of the overhead" proportional to his revenue production); *Fix v. McAllister*, 615 S.E.2d 547, 549 (Ga. [Ct.] App. 2005) (compensation of doctor who was an employee was "equal to the actual medical fees billed and collected by [e]mployee for her services to patients reduced by an amount equal to [e]mployee's allocated overhead expenses"); *Dolezal v. Plastic & Reconstructive Surgery, S.C.*, 640 N.E.2d 1359[, 1369] (Ill. [Ct.] App. 1994) (physician employee "was entitled to receive every dollar of income which he brought into [practice], less his pro rata share of the company's overhead expenses").

This is all well and good, and perhaps if the record contained more detail about the standard that controlled Dr. Patel's contribution to overhead, it would be a factor to be considered regarding whether he was an employee. All the trial record shows here is that he shared overhead—a fact that might have been a condition of his employment or something he did when he could.

111

may be both undisputed and inconclusive. Neither opinion cited by the Joneses alters our conclusion that Dr. Patel's testimony was not conclusive.

The Joneses first cite *Lauret v. Meritage Homes of Tex., LLC*, 455 S.W.3d 695 (Tex. App.—Austin 2014, no pet.) (op. on reh'g). The question in *Lauret* was whether the plaintiffs waived a claim under the Texas Deceptive Trade Practices Act by not submitting an issue to the jury on whether they were purchasing property as their residence. *Id.* at 701. Both the plaintiffs and an employee of the defendant property seller testified that it was the plaintiffs' intent to use the home as a residence, and the employee testified that the seller had a policy of not selling property to investors. *Id.* at 701–02. The defendant offered no evidence to contradict what was said by the plaintiffs and its employee. *Id.* at 702. *Lauret* concluded that no issue remained for the jury on the question of whether the property was to be used as a residence because

> [t]he evidence establishe[d] that this was a contract for the purchase of a consumer's residence as a matter of law[,] and[] therefore, the DTPA applie[d]. *See* Tex. Bus. & Com. Code [Ann.] § 17.49(g); *City of Keller . . .* , 168 S.W.3d [at] 820 . . . ("Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistenc[i]es, and could have been readily controverted.").

*Id.* The single question of whether someone plans to occupy property as a residence is a straightforward factual inquiry—not involving the fraught mixed questions of law and fact that underly the application of respondeat superior. Further, *Lauret* concluded that the testimony on the residence question was "clear, positive, direct,

112

otherwise credible, free from contradictions and inconsistenc[i]es"—characteristics that we conclude Dr. Patel's testimony did not have. *See id.*

Next, the Joneses cite *Alpha Omega CHL, Inc. v. Min*, No. 05-15-00124-CV, 2016 WL 3381848 (Tex. App.—Dallas June 16, 2016, no pet.) (mem. op.). *Min* presented the question of whether it was error for a trial court to refuse to find that a party had proven the existence of a fiduciary duty by a preponderance of the evidence. *Id.* at *3. *Min* concluded that an escrow-agent relationship, and thus a fiduciary duty, had been established as a matter of law. *Id.* The opinion detailed the evidence on the question of whether an escrow-agent relationship existed as follows:

> There was no evidence presented at trial that appellees were not the escrow agent for the transaction. And appellee Min testified that he was the escrow agent for the transaction. Min testified that he, "[a]s an escrow officer," explained exhibit 2, the purchaser's statement, to [appellant's] representative. Later, Min testified that his law firm (the other appellee in this case) was the "closing or escrow agent" referred to in the purchaser's statement. Min also testified that he, "as the escrow agent," checked the county records for liens and performed a UCC search for the equipment. When [appellant's] counsel asked Min if he was acting as an attorney explaining [appellant's] rights as the purchaser, Min answered, "More of an escrow officer. Escrow officer." Min answered, "Yes," when he was asked, "So Min Law, PC, and Brian Min was [sic] only acting as an escrow agent when [appellant] engaged their services." Finally, during a colloquy between the trial court and counsel after the close of evidence, the trial court asked appellees' counsel, "So your theory is that your client operated only as a[n] escrow agent closing the deal?" Appellees' counsel answered, "Yes."

*Id.* at *4. Like almost any question of evidentiary sufficiency, the question in *Min* was one of degree. Min, a lawyer, had testified in detail about the legal status that he occupied in a transaction. There is a wide gulf between that testimony and Dr. Patel's

113

untutored, contradictory testimony and his nebulous testimony on the right-to-control issue that is central to respondeat superior. Again, "[u]ndisputed evidence and conclusive evidence are not the same—undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed." *City of Keller*, 168 S.W.3d at 816. The wide gulf between the facts of *Min* and this case make that opinion inapposite.

Finally, the Joneses cite *Salaiz* to support the contention that "[i]n order to refute Dr. Patel's employment status and Bianco's vicarious liability (and prevent joint and several liability), Bianco was required to present 'positive evidence to the contrary.'" 866 S.W.2d at 637. In *Salaiz*, a presumption was at play because "the evidence that [the defendant driver] was an employee of [the defendant employer] and that [the employer] owned the car involved in the collision raised a presumption that [the driver] was in the course and scope of his employment at the time of the accident." *Id.* The employer was required to produce some evidence to rebut the presumption and was "not required to prove as a matter of law that [the driver] was not within the course and scope of his employment in order to refute the presumption." *Id.* No presumption like that found in *Salaiz* is at play here. Thus, the argument that nonconclusive evidence was in some way transformed into conclusive evidence absent refutation from Bianco is not supported by *Salaiz*.

114

**7.** **We do not consider the evidence outside the trial record that the Joneses rely on to prove Dr. Patel's employment status, and the Joneses have not preserved a complaint that the trial court erred by not considering the evidence.**

The Joneses would have us review evidence that they tried to submit after the verdict and which they tried to place before the court in their motion to reopen the evidence. The trial court did not rule on the motion to reopen and did not indicate that it had considered the evidence. To the contrary, "[t]he [c]ourt [found] that the evidence *presented at trial* conclusively established that [Dr.] Patel was acting in the course and scope of his employment with Bianco PLLC at all times relevant to this lawsuit and [that] no reasonable juror could have found otherwise." [Emphasis added.] The record thus contains no indication that the evidence offered postverdict was ever admitted by the trial court, and it is beyond our purview to consider it. *See Arredondo v. Rodriguez*, 198 S.W.3d 236, 239 n.1 (Tex. App.—San Antonio 2006, no pet.) ("We will not consider evidence that the trial court itself did not consider.").

The Joneses sought to have the trial court consider the evidence through their motion to reopen, but the record does not contain a ruling on that motion. To preserve error, the Joneses were required to obtain a ruling on their motion by which they tried to place the evidence before the trial court. *See* Tex. R. App. P. 33.1(a)(2) ("As a prerequisite to presenting a complaint for appellate review, the record must show that . . . the trial court: (A) ruled on the request, objection, or motion, either expressly or implicitly; or (B) refused to rule on the request, objection, or motion, and

115

the complaining party objected to the refusal."). This they did not do; thus, the Joneses' claim that the trial court should have considered the additional evidence is not preserved for our review.[35]

### C. We set forth our conclusion on the vicarious liability claim.

We hold that the Joneses waived their independent ground of recovery of respondeat superior by failing to submit a jury issue on the ground when the evidence establishing the ground was not conclusive. We sustain Bianco's sole issue. We reverse the trial court's judgment that Bianco is jointly and severally liable for the Joneses' damages and render judgment that the Joneses take nothing from Bianco.

## V. Conclusion

Having overruled Dr. Patel's legal- and factual-sufficiency challenges as to Dr. Patel, but having sustained Bianco's sole issue, we affirm the judgment as to Dr. Patel, but we reverse the trial court's judgment that Bianco is jointly and severally

---

[35]We also note the strictures of Texas Rule of Civil Procedure 270, which provides that "[w]hen it clearly appears to be necessary to the due administration of justice, the court may permit additional evidence to be offered at any time; *provided that in a jury case no evidence on a controversial matter shall be received after the verdict of the jury*." Tex. R. Civ. P. 270 (emphasis added). As we recently held, "In a jury trial, an issue is a 'controversial matter' if it was submitted to the jury." *McCreary v. McCreary*, No. 02-23-00187-CV, 2024 WL 3896422, at *7 (Tex. App.—Fort Worth Aug. 22, 2024, no pet.) (mem. op.) (quoting *Harrington v. State*, 385 S.W.2d 411, 424 (Tex. App—Austin 1964) ("We understand Rule 270 to refer to a controversial matter which has been or should be submitted to the jury."), *rev'd on other grounds*, 407 S.W.2d 467 (Tex. 1966)). Our holding above is that the respondeat superior ground should have been submitted to the jury and was thus a controversial matter. Rule 270 imposes a deadline on when a trial court can permit additional evidence, which the Joneses' effort to add evidence to the record in this matter transgresses.

116

liable for the Joneses' damages and render judgment that the Joneses take nothing from Bianco.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  April 17, 2025